[Cite as *State v. Williamson*, 2019-Ohio-4380.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio

    Appellee/Cross-Appellant

v.

Terrance R. J. Williamson

    Appellant/Cross-Appellee

Court of Appeals Nos. WD-18-049
WD-18-051

Trial Court No. 2016CR0089

**DECISION AND JUDGMENT**

Decided: October 25, 2019

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, David T.
Harold and James A. Hoppenjans, Assistant Prosecuting Attorneys,
for appellee/cross-appellant.

Nathan T. Oswald, for appellant/cross-appellee.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} In this consolidated appeal, defendant-appellant, Terrance Williamson,

appeals the June 22, 2018 judgment of the Wood County Court of Common Pleas which,

following a trial to the court, sentenced appellant to a total of 40 and one-half years of

imprisonment. For the reasons that follow, we affirm appellant's convictions but vacate the judgment and remand for resentencing.

{¶ 2} A 13-count indictment was filed against appellant on February 18, 2016. The charges stemmed from an incident on January 30, 2016, where a mother and daughter were shot in their home in Fostoria, Wood County, Ohio. Appellant, the alleged perpetrator, was the mother's boyfriend.

{¶ 3} On May 22, 2018, the matter proceeded to a bench trial and the following relevant evidence was presented. Fostoria Police Officer Shilo Frankart testified regarding verified copies of appellant's prior convictions. The three separate judgment entries included convictions for third-degree felonies of possession of cocaine and having a weapon while under a disability, two fourth-degree felonies of trafficking in cocaine and a fifth-degree felony possession of drugs.

{¶ 4} Doug H. testified that his home in Curtice, Ohio, had been burglarized in May 2009, and that the 9 mm Taurus PT111, serial number TAN31139, that was taken from his home was recovered in the present case. Doug identified the weapon.

{¶ 5} Victim and girlfriend, Lashelle N., testified that she and appellant had been together for eight years and that they also sold drugs together. Lashelle stated that appellant would get the drugs, crack cocaine and heroin, for her to sell.

{¶ 6} Lashelle testified that on January 29, 2016, she lived in a mobile home in Fostoria, Wood County, Ohio, with her daughter, A.J., then 17. She stated that she would often spend the night in Toledo, Ohio, at appellant's house. On that night she was in

2.

Toledo with appellant and they were "snorting stuff" and both high. The next morning, appellant was confused and could not recall how he had gotten to bed. Later that day they, including appellant's two young sons, were driving to appellant's daughter's school to watch her basketball game, but appellant could not remember how to get to the school.

{¶ 7} Lashelle testified that when the group returned to appellant's house appellant, without provocation, backhanded her and she fell on the couch. Appellant stated that she was trying to "play" him because she was not letting him hold any of the drug money. Appellant then fired a gun at Lashelle and the bullet went between Lashelle and appellant's four-year-old son.

{¶ 8} Lashelle testified that appellant then told her that they were going to her home in Fostoria so he could get the money. The group got back in the Chevy HHR and proceeded to Fostoria with Lashelle driving. Lashelle stated that along the route her daughter called her; Lashelle informed her to not allow anyone over because they were on their way. At that point, appellant held the gun to her head and said "if I told her anything he would blow my head off." He also told her that if she stopped at her grandmother's house two doors down from hers, that he would shoot them (including her father and brother) too.

{¶ 9} Upon arriving at the home, Lashelle proceeded to the back of the trailer to her bedroom to get the money. Appellant followed her and she handed it to him. Once back in the front room, appellant and Lashelle argued about her taking him back to

3.

Toledo. She refused because he had a gun. A "tussle" ensued over the car keys and Lashelle wound up on the ground.

{¶ 10} According to Lashelle, A.J. got up and Lashelle warned her that appellant had a gun. This angered appellant and he fired multiple shots hitting her daughter in the leg. Lashelle testified that she fell on A.J. to protect her and was shot in her chest and stomach. Appellant then left taking the car keys with him. Lashelle stated that she was able to unlock her phone and call 911; the recording was played for the court.

{¶ 11} During cross-examination, Lashelle again testified that on the day of the shooting appellant was confused; the confusion continued up until the shooting. Lashelle stated that she knew appellant took the prescription drug Klonopin, that it made him "flip" and that he had recently been prescribed a higher dose. Lashelle stated that the Chevy HHR involved in the events was leased in her name but that appellant put down money for it. She said that based on the parties' relationship, she considered the car jointly owned. Lashelle agreed that it was her father who indicated on the 911 tape that appellant stole her car. Finally, Lashelle testified that appellant did not make her get in the car and go from Toledo to Fostoria; that, other than appellant's confusion, she did not object to being in the car.

{¶ 12} During re-direct examination, Lashelle acknowledged that since the day of his arrest she had been talking with appellant frequently despite a no contact order. She also admitted that appellant offered to buy her daughter a car if she stopped talking to

4.

police. Lashelle further admitted that the leased Chevy HHR was in her name only and that she maintained the insurance. She testified that payments were made by both parties.

{¶ 13} Regarding the Klonopin, Lashelle stated that the night before the events at issue, they took both Klonopin and pain medication by crushing the pills and snorting them. She agreed that this method was not prescribed by a doctor.

{¶ 14} Finally Lashelle admitted to past physical violence between the pair. Appellant had used violence to get what he wanted from her. On occasion, it had occurred in front of her daughter.

{¶ 15} Lashelle's father, Todd R., testified that on the day of the shooting he was living in his mother's trailer a few lots down from Lashelle. He was outside smoking a cigarette in his truck when he heard some "pops" coming from the direction of her trailer. He did not immediately identify them as gunshots but, on "instinct," ran toward Lashelle's trailer. Todd testified that he saw appellant, with whom he is familiar, run out of Lashelle's door, jump into the HHR, and drive off on State Route 199.

{¶ 16} Fred Reinhart of the Fostoria Fire Department testified that on January 30, 2016, he responded to a call of two people shot. Reinhart treated A.J. Joseph Gill, also a member of the Fostoria Fire Department, treated Lashelle. Gill testified that Lashelle was alert and oriented.

{¶ 17} Lashelle's daughter, A.J., testified next. She stated that there was physical violence in the relationship between appellant and her mother and that on one occasion

5.

appellant was physical with her. A.J. stated that the violence between her mom and appellant was generally over money, sometimes over drugs.

{¶ 18} A.J. testified that Lashelle had the Chevy HHR for about one week prior to the incident. She had not seen appellant drive the car or give Lashelle money for the car.

{¶ 19} A.J. stated that on the day of the shooting, her mom called her from the car crying. Lashelle said they were coming to the house and not to have anyone come over. When Lashelle and appellant arrived her hair was disheveled and she was crying. The two walked back to Lashelle's bedroom; A.J. could not hear what they were talking about because she had headphones on. When they came out, appellant walked past A.J. toward the front door and Lashelle sat down on the couch crying. Lashelle got up and went toward the door which was behind A.J. who was sitting in a chair. A.J. testified that appellant hit Lashelle and she careened into the door which then struck the chair A.J. was sitting on so she had to stand up.

{¶ 20} Once A.J. got out of the chair she observed that appellant had a gun which he pointed at her. A.J. believed that he aimed the gun at her head and shot but that it was the second shot that hit her in the left leg. A.J. stated that after she fell to the floor her mom crawled over and laid on top of her; appellant was trying to take the car keys from her. Appellant shot Lashelle and then took the keys.

{¶ 21} Fostoria Police Officer Trey Farabee testified that on January 30, 2016, he responded to a call to Lot 85 at Nye's Trailer Park. Officer Farabee arrived at the same time as Officer Gabe Wedge and Sergeant Campbell. Paramedics arrived shortly

6.

thereafter. Officer Farabee observed two female gunshot victims. Officer Farabee identified various photographic exhibits depicting the crime scene.

{¶ 22} Fostoria Police Officer Wedge testified that a be on the lookout ("BOLO") was put out for the Chevy HHR and a call came in from the Wood County Sheriff's office that they had the vehicle approximately six miles away north on State Route 199. When Wedge arrived on the scene, he observed the vehicle out in a field and appellant was handcuffed in the back of a Wood County cruiser. Appellant's children, who Wedge surmised to be four and six years old, were also in the back of the cruiser and were unharmed. Officer Wedge read appellant his Miranda rights; Wedge testified that appellant indicated that he understood and he did not appear to be impaired in any way. Appellant was arrested approximately 15 to 20 minutes after the shooting.

{¶ 23} Officer Wedge testified that he observed spots of blood on the lower portion of appellant's pants and his shoes; he ascertained that appellant was not injured. Officer Wedge identified the items in court.

{¶ 24} Ohio Bureau of Criminal Identification and Investigation ("BCI") special agent Megan Roberts, assigned to the crime scene unit, processed the crime scene by first taking photographs which were admitted into evidence. Agent Roberts was also given the recovered handgun. She testified that there was black hair in the gun and that the gun was jammed. Roberts collected projectiles and cartridge casings and blood-stained clothing. All physical evidence was transferred in either bags or envelopes to the Fostoria Police Department.

7.

**{¶ 25}** Wood County Sheriff's Deputy Rob Eaton testified that following the BOLO alert, he spotted the Chevy HHR on State Route 199 just after it had driven off the road. Eaton observed appellant getting out and helping his children get out of the vehicle. Deputy Eaton testified that based on the information he received he was concerned about the safety of the situation; he drew his weapon, held it low, and motioned for appellant to approach with his children. Appellant complied.

**{¶ 26}** Deputy Eaton's body cam video was played and stopped at intervals while he narrated. Appellant was asked whether he rolled his vehicle or just went off the road; appellant responded that he just went off the road. Eaton stated that appellant did not delay in answering or slur his words; he did not appear impaired. Appellant was also asked if he was injured; he stated that he was "a little banged up." Deputy Eaton asked appellant about the blood on his left pant leg and boot. According to Eaton, appellant stated that he was not injured, that it was just a part of his pants. Eaton then lifted appellant's pants leg and removed his boot looking for a source of the blood. No wounds were found. Deputy Eaton also found a sum of money in appellant's pants pocket; it was initially left with appellant. Appellant was read his Miranda rights and taken into custody.

**{¶ 27}** Wood County Sergeant James Kimble testified that Deputy Eaton radioed him that he came across the vehicle described in the BOLO. Upon arrival, appellant and the children were out of the vehicle; Kimble escorted the juveniles back to his cruiser.

8.

Sergeant Kimble recounts his attempts at contacting a family member to get the children. Ultimately, family members met him at the sheriff's office in Bowling Green, Ohio.

{¶ 28} Sergeant Kimble stated that he asked appellant for the contact information for the children. Kimble stated that appellant responded appropriately and had no difficulty giving him the telephone numbers. Kimble noted no signs of impairment in appellant.

{¶ 29} Wood County Sheriff's Deputy Isaiah Loar testified that on January 30, 2106, he arrived at the accident scene on State Route 199 after appellant was in handcuffs. Loar stood with Deputy Eaton and appellant for several minutes and testified that appellant did not appear to be impaired.

{¶ 30} Deputy Loar stated that he then spoke with the children asking them whether they had seen a firearm. The older child said that he saw a black and gray pistol and that he saw his father throw it out the window shortly after they left the trailer park. The child said that he saw his father wipe off the gun prior to throwing it out the window. The gun was recovered in Fostoria by another deputy within throwing distance of State Route 199.

{¶ 31} All three officers were cross-examined, in part, about the differences in the indications of alcohol versus drug impairment. The officers acknowledged that not all drug intoxication symptoms mirror alcohol intoxication, i.e., slurred speech, red eyes, delayed response, and unsteady gait.

9.

{¶ 32} Fostoria Police Detective Brandon Bell testified that he responded to an incident at Nye's Trailer Park. Detective Bell was then called to the scene on State Route 199, approximately one to one-and-one-half miles away, where the firearm was found by a Wood County deputy. He photographed and collected the gun. Detective Bell stated that a round of ammunition was stuck in the weapon between the slide and the barrel. Bell testified that the debris in the slide appeared to be human hair and mud or dirt.

{¶ 33} BCI Forensic Scientist Vicki Bartholomew testified that the firearm did not reveal any latent fingerprints. Julie Cox, also of the BCI, performed a biological substance analysis of various items recovered from the scene. Appellant's jeans tested positive for the presence of blood. Debris from the firearm was submitted for a nuclear DNA analysis. BCI Forensic Scientist Devonie Herdeman performed DNA analyses on the jeans and debris from the firearm. Victim, A.J., was included as a contributor of the blood stain from the jeans; the statistical probability of the result is rarer than one in one trillion. As to the debris from the firearm, it was consistent with Lashelle N., again with a rarer than one in one trillion probability. The reports from the witnesses were admitted into evidence.

{¶ 34} The final witness was Fostoria Police Officer Shilo Frankart. Officer Frankart testified that he was called in to head the shooting investigation and he photographed the crime scene. Officer Frankart stated that he went to Fostoria Community Hospital and briefly spoke with the shooting victims; he then prepared and had a search warrant signed for the BCI to process the crime scene. Frankart testified

10.

regarding the photographs taken including photographs of the victims' injuries following their release from the hospital.

{¶ 35} Officer Frankart interviewed Lashelle and her daughter at Toledo Hospital. Both victims stated that appellant was the shooter and that he took Lashelle's vehicle and $300. The recordings were admitted into evidence.

{¶ 36} Officer Frankart testified regarding multiple jail telephone conversations between appellant and his sister and appellant and Lashelle. Notably, when asked, Lashelle indicated that she was staying with appellant and that it was the "f-ing pills" that caused him to shoot her. Appellant bemoaned the fact that the whole incident stemmed from $300, and stated that Lashelle should have just gotten in the car with him. Appellant also offered to buy A.J. a car if she "comes around."

{¶ 37} In addition, the parties entered into three stipulations of evidence. First, that appellant's hands were swabbed for DNA and the swabs were relayed to BCI. Second, that the swabs were tested and the results were marked as an exhibit. Finally, the admission of the results of the ballistics testing conducted by the BCI.

{¶ 38} At the conclusion of the trial, the court found appellant guilty of both counts of attempted murder and felonious assault, kidnapping, aggravated robbery, having weapons while under disability, grand theft of a motor vehicle, and tampering with evidence. Appellant was also found guilty of the attached firearms specifications. Appellant was acquitted of receiving stolen property.

**{¶ 39}** At the June 18, 2018 sentencing hearing, discussions were held about which offenses and specifications would merge. The court merged the attempted murder and felonious assault convictions but denied appellant's request to merge the aggravated robbery and kidnapping convictions. Over objection by the state, the court concluded that the three-year and one-year gun specifications merged because it was not possible to commit a one-year violation without committing a three-year violation.

**{¶ 40}** On June 22, 2018, the court grouped appellant's convictions and sentenced him as follows: Count Nos. 3, 5, and 6, kidnapping, aggravated robbery, and attempted murder of Lashelle N., appellant received 11-year sentences for each count and three mandatory three-year terms for the firearm specifications. Count No. 9, attempted murder of A.J., 11 years of imprisonment with a three-year sentence for the firearm specification. Count Nos. 2, 12, and 13: having weapons under a disability, 18 months with a one-year firearm specification, grand theft of a motor vehicle, 18 months and three-year term for the firearm specification, and tampering with evidence, 18 months with a one-year term for the firearm specification.

**{¶ 41}** Appellant was sentenced to a prison term of 23 years and 6 months for the underlying offenses. The court imposed an additional 17 years of imprisonment for the firearm specifications for a total of 40 years and 6 months. This appeal and cross-appeal followed.

12.

{¶ 42} Appellant raises the following assignments of error for our review:

Assignment of Error No. 1:  Terrance Williamson received ineffective assistance of counsel because counsel effectively waived Williamson's primary defense, failed to adduce evidence necessary to support that defense, and failed to object to improper evidence that tended to negate the defense.

Assignment of Error No. 2:  The evidence was insufficient to convict Williamson of aggravated robbery and grand theft of a motor vehicle because Williamson had an interest in the property that was the subject of those offenses.

Assignment of Error No. 3:  The trial court erred by failing to merge the kidnapping and aggravated robbery offenses against Lashelle Norman.

Assignment of Error No. 4:  Williamson was sentenced in error because the trial court wrongly believed that it had no discretion to impose concurrent terms of imprisonment for firearm specifications beyond the two most serious ones.

{¶ 43} Appellant also raised a "supplemental" assignment of error in his reply brief which provides:

(Supplemental) Assignment of Error No. 5:  Williamson was sentenced in error because he was not previously convicted of a first or

13.

second-degree felony when he was sentenced on a firearm specification for having a weapon under a disability.

{¶ 44} Cross-appellant, state of Ohio raises the following assignment of error:

**First Assignment of Error:** The trial court erred in merging the firearm specifications.

{¶ 45} In appellant's first assignment of error he argues that he received ineffective assistance of counsel based on his attorney's failure to pursue the affirmative defense of involuntary intoxication. To prevail on a claim of ineffective assistance of counsel, a defendant must prove two elements: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Proof of prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus.

{¶ 46} Appellant argues that counsel essentially "waived" his involuntary intoxication defense by stating during closing arguments that appellant was "voluntarily" intoxicated, by failing to elicit the testimony of a medical professional regarding the

14.

common effects of Klonopin, and by failing to object to the state's evidence that when they arrested appellant he did not appear intoxicated.

{¶ 47} Unlike voluntary intoxication, R.C. 2901.05(E), involuntary intoxication is an affirmative defense. *State v. Johnston*, 2d Dist. Montgomery No. 26016, 2015-Ohio-450, ¶ 33. As such, a defendant has the burden of proof by a preponderance of the evidence. *State v. Luebrecht*, 3d Dist. Putman No. 12-18-02, 2019-Ohio-1573, ¶ 39, citing *State v. Kortz*, 2d Dist. Montgomery No. 25041, 2013-Ohio-121, ¶ 20; R.C. 2901.05(A).

{¶ 48} A successful involuntary intoxication defense may arise in cases involving the proper use of a prescribed medication. *See State v. McKeon*, 38 P.3d 1236, 1240 (Az.App.2002), citing *State v. Gardner*, 870 P.2d 900, 902 (Utah 1993); *Brancaccio v. State*, 698 So.2d 597, 600 (Fla.Dist.Ct.App.1997). The intoxicating effects of the drug must not be known to the individual. *Mendenhall v. State*, 15 S.W.3d 560, 565 (Tex.App.2000).

{¶ 49} In the instant case, appellant did not take Klonopin in the prescribed manner. Appellant crushed Klonopin and pain killers and snorted them in order to maximize the intoxicating effects. Further, Lashelle testified that on prior occasions appellant "flipped out" when taking Klonopin. Finally, the incident in question did not happen in isolation. Testimony was presented of instances of past violence between appellant and Lashelle as well as appellant and A.J.

15.

**{¶ 50}** Importantly, counsel fully explored appellant's mental state by initially entering a not guilty by reason of insanity plea and having appellant submit to a competency evaluation. At trial, appellant's counsel repeatedly questioned witnesses about appellant's mental state and the indices of drug intoxication. Based on the foregoing, we find that counsel was not ineffective in his representation of appellant. Appellant's first assignment of error is not well-taken.

**{¶ 51}** In his second assignment of error, appellant argues that his convictions for aggravated robbery and grand theft of a motor vehicle were not supported by sufficient evidence. Sufficiency of the evidence is "'that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support a jury verdict as a matter of law.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1433 (6th Ed.1990). In *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), the Ohio Supreme Court outlined the analysis required to apply this standard:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable

doubt. (*Jackson v. Virginia* [1979], 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.) *Id.* at paragraph two of the syllabus.

{¶ 52} Relevant to this assignment of error, appellant was convicted of aggravated robbery and grand theft of a motor vehicle. To be convicted of aggravated robbery, the state was required to prove that "in attempting or committing a theft offense," appellant had "a deadly weapon on or about [his] person or under [his] control" and that he "either display[ed] the weapon, brandish [ed] it, * * * or use[d] it." R.C. 2911.01(A)(1). To convict appellant of grand theft of a motor vehicle, the state was required to prove, beyond a reasonable doubt, that he did "knowingly * * * obtain or exert control" over the vehicle "[b]eyond the scope of the express or implied consent of the owner or person authorized to give content." R.C. 2913.02(A)(2), (B)(5).

{¶ 53} Appellant claims that he had an ownership interest in the $300 allegedly stolen from Lashelle and the Chevy HHR. As to the $300, there was varying testimony as to the source of the funds. Lashelle initially stated that the money was from her workers' compensation benefits; she later stated that it was shared illicit drug sale proceeds. It is undisputed that the money was kept separately at Lashelle's residence. Viewing the evidence in a light most favorable to the state, we find that sufficient evidence supported appellant's aggravated robbery conviction.

{¶ 54} As to the Chevy HHR, appellant claimed an ownership interest by providing some money for a down payment and lease payments. However, the evidence presented at trial demonstrated that Lashelle was named on the lease and maintained

17.

insurance on the vehicle. She stated that on the day of the incident she would not drive appellant back to Toledo; she would not give him the car keys so he took them from her and took the vehicle without her consent. On review, the evidence was sufficient to support a grand theft of a motor vehicle conviction. Appellant's second assignment of error is not well-taken.

{¶ 55} Appellant's third assignment of error maintains that the trial court erroneously failed to merge the kidnapping and aggravated robbery convictions as they were allied offenses. Appellant raised this argument before the trial court and the court made a merger determination; thus, we apply a de novo standard of review. *See State v. Roberson*, 2018-Ohio-1955, 113 N.E.3d 204, ¶ 12 (6th Dist.); *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 1.

{¶ 56} R.C. 2941.25 provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶ 57}** In determining whether offenses are allied within the meaning of R.C. 2941.25, "courts must evaluate three separate factors- the conduct, the animus, and the import." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, at paragraph one of the syllabus. The *Ruff* court further explained:

> Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus.

*Id.* at paragraph three of the syllabus.

**{¶ 58}** Kidnapping and aggravated robbery can be allied offenses. *See generally State v. Winn*, 121 Ohio St.3d 413, 2009-Ohio-1059, 905 N.E.2d 154. "A brief restraint of the victim is present in every aggravated robbery." *State v. Jackson*, 1st Dist. Hamilton No. C-180341, 2019-Ohio-2027, ¶ 10, citing *State v. Morris*, 1st Dist. Hamilton No. C-150421, 2016-Ohio-5490, ¶ 17. To determine whether kidnapping and another offense are subject to merger, the primary question is "'whether the restraint or movement of the victim is merely incidental to a separate underlying crime or, instead, whether it has a significance independent of the other offense.'" *State v. Dean*, 2018-Ohio-1740, 112 N.E.3d 32, ¶ 66 (6th Dist.), quoting *State v. Logan*, 60 Ohio St.2d 126, 135, 397 N.E.2d 1345 (1979). Where the restraint of the victim is prolonged, the

confinement of the victim secretive, or the movement of the victim is substantial, there exists a separate animus for each offense. *Logan* at syllabus. A separate animus also exists where "the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime." *Id.*

{¶ 59} Appellant argues that under the present facts, the kidnapping was "incidental" to the aggravated robbery.[1] They left Toledo and drove straight to Fostoria with the sole intent of getting appellant his money. Appellant further asserts that Lashelle was under the same risk of harm from Toledo, where appellant first "brandished" (or, more accurately fired) his weapon until the robbery was completed in Fostoria. We disagree.

{¶ 60} The restraint was prolonged and the movement was substantial. *See Dean* at ¶ 69. Appellant shot at appellant and then forced her to take him to Fostoria to get what he believed was his money. During the trip, Lashelle was at great risk of harm. Her daughter testified that Lashelle called and told her not to have anyone over when they got there; she was clearly upset and crying. Appellant threatened to kill Lashelle during the drive and then threatened to kill members of her family.

---

[1] Although we agree with appellant that the state wrongly indicated that appellant was convicted under R.C. 2905.01(A)(3), this fact does not change the substance of our analysis.

20.

{¶ 61} Based on the foregoing, we find that the trial court did not err when it found that the aggravated robbery and kidnapping counts were not allied offenses. Appellant's third assignment of error is not well-taken.

{¶ 62} In appellant's fourth assignment of error he argues that the court erroneously believed that it was required to sentence him to consecutive terms for the firearm specifications beyond the two more serious ones. Similarly, yet contrary, the state's sole assignment of error argues that the trial court erred by merging the one-year firearm specifications with the three-year specifications. Since related, the alleged errors will be jointly addressed.

{¶ 63} R.C. 2929.14, provides in relevant part:

(B)(1)(a) Except as provided in division (B)(1)(e) of this section, if an offender who is convicted of or pleads guilty to a felony also is convicted of or pleads guilty to a specification of the type described in section 2941.141, 2941.144, or 2941.145 of the Revised Code, the court shall impose on the offender one of the following prison terms:

* * *

(g) If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of

this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

{¶ 64} Both parties argue the application of this court's case captioned *State v. Welninski*, 2018-Ohio-778, 108 N.E.3d 185 (6th Dist.). In *Welninski*, the appellant challenged the trial court's imposition of consecutive sentences for a three-year firearm specification and five, one-year firearm specifications. We determined that the clear language of the statute granted the trial court discretion to order the firearm specifications to run consecutively. *Id.* at ¶ 106.

{¶ 65} As to the state's assignment of error challenging the court's "merger" of the firearm specifications, R.C. 2941.141(B) provides that the "[i]mposition of a one-year mandatory prison term upon an offender under division (B)(1)(a)(iii) of section 2929.14 of the Revised Code is precluded if a court imposes an eighteen-month, three-year, fifty-four-month, six-year, or nine-year mandatory prison term on the offender under division (B)(1)(a)(i), (ii), (iv), (v), or (vi) of that section relative to the same felony."

{¶ 66} This court has addressed this sentencing issue in *State v. Ellis*, 6th Dist. Wood Nos. WD-15-035, WD-17-036, 2019-Ohio-427. In *Ellis*, relying on the above-quoted statute, we determined that "because the trial court imposed the three-year firearm

specification, it was statutorily precluded from also imposing the one-year firearm specification on the same count." *Id.* at ¶ 17, citing *State v. Freeman*, 8th Dist. Cuyahoga No. 106363, 2018-Ohio-2936, ¶ 7.

**{¶ 67}** The trial court's June 22, 2018 sentencing judgment entry provides:

The court found that where there was a 1 year and a 3 year firearm specification on a count that they would merge as a defendant could not violate a 3 year specification without also violating a 1 year specification. Otherwise the court found that the specifications, by law, were mandatory and were required to be served consecutively. The court also found that where the underlying offenses merged, the firearm specifications did not merge.

**{¶ 68}** Reviewing the proceedings below and the trial court's judgment entry, we find that the court erred when imposing consecutive prison terms for the various gun specifications. It is undisputed that R.C. 2929.14(B)(1)(g) allows for the imposition of consecutive sentences for firearm specifications. However, in the present case the trial court incorrectly found that the imposition of such sentences was mandatory. The court did not err by failing to impose additional one-year firearm specifications. Accordingly, we find appellant's fourth assignment of error well-taken and the state's sole assignment of error not well-taken.

23.

**Appellant's Fifth Assignment of Error and the State's Motion to Strike**

{¶ 69} Appellant's fifth assignment of error was raised in its reply brief without leave of court. The state has filed a motion to strike the supplemental assignment of error and appellant filed a memorandum in opposition.

{¶ 70} App.R. 16(C) states, in relevant part, "The appellant may file a brief in reply to the brief of the appellee * * *." Unlike App.R. 16(A), which permits assignments of error to be presented in appellant's merit brief, App.R. 16(C) does not permit new assignments of error to be presented in a reply brief.

{¶ 71} This court has refused to consider additional assignments of error or arguments included in reply briefs. *See State v. Darden*, 6th Dist. Erie No. E-09-030, 2010-Ohio-26, fn. 1. *See also State v. Spaulding,* 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 179, citing *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 18; *Everbank Mtge. Co. v. Sparks*, 12th Dist. Warren No. CA2011-03-021, 2012-Ohio-886, fn. 2. Based on the facts of this case, we decline to address appellant's fifth assignment of error raised in his reply brief and it is stricken.

{¶ 72} On consideration whereof, the judgment of the Wood County Court of Common Pleas is reversed as to appellant's sentence only. Appellant's sentence is vacated and the matter is remanded to the trial court for resentencing. Pursuant to App.R. 24, the state is ordered to pay the costs of this appeal.

Judgment reversed in part,
vacated and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.                         _____
                                                      JUDGE

Christine E. Mayle, P.J.


Gene A. Zmuda, J.                             _____
CONCUR.                                                   JUDGE


                                                   _____
                                                      JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.