[Cite as *State v. Silvas*, 2021-Ohio-4473.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

CESAR L. SILVAS,

    DEFENDANT-APPELLANT.

CASE NO. 17-21-03

O P I N I O N

Appeal from Shelby County Common Pleas Court
Trial Court No. 20CR000102

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision:  December 20, 2021

APPEARANCES:

    *Peter Galyardt* for Appellant

    *Timothy S. Sell* for Appellee

Case No. 17-21-03

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant Cesar L. Silvas ("Silvas") appeals the judgment of the Shelby County Court of Common Pleas, arguing (1) that his convictions are against the manifest weight of the evidence; (2) that his convictions are not supported by sufficient evidence; (3) that R.C. 2967.271 ("the Reagan Tokes Law") is unconstitutional; and (4) that the trial court erred in the process of sentencing him. For the reasons set forth below, the judgment of the trial court is affirmed in part and reversed in part.

*Facts and Procedural History*

{¶2} On March 24, 2020, Officer Jim Jennings ("Officer Jennings"), who works for the Sidney Police Department, was on patrol. Tr. 94. He observed a 2005 Acura ("Acura") pass by that did not have a front license plate and had a "high rear plate." Tr. 94. Doc. 1. Officer Jennings then ran the license plate and found that the Acura "was not valid to drive." Tr. 95. He then activated his lights to initiate a traffic stop near Exit 93 on Interstate 75. Tr. 95. However, Officer Jennings testified that the Acura did not pull over to the side of the road until they had passed Exit 94. Tr. 95.

{¶3} The driver of the Acura, who was later identified as Silvas, was accompanied by one passenger, who was later identified as a Mr. Lugo ("Lugo"). Tr. 114. When Officer Jennings approached the vehicle, Lugo opened his door. Tr. 96. Officer Jennings testified that, "[w]hen the door opened, I smelled the odor of

-2-

marijuana." Tr. 96. Neither Silvas nor Lugo spoke English, but Officer Jennings managed to ask Silvas and Lugo for identification before calling for backup. Tr. 96-98. The driver's license tendered to Officer Jennings by Silvas was later examined and found to be a fake identification card. Tr. 98.

{¶4} Detective Ethan Brown ("Detective Brown") and Detective Mark Brunson responded to Officer Jennings's call for backup. Tr. 132-133. At this point, the police searched the Acura. Tr. 101. Officer Jennings found a marijuana cigarette in the ashtray. Tr. 101. The police then discovered four baggies in a compartment under "the carpet on the passenger side floorboard * * *." Tr. 101. One of the baggies contained a white powder that subsequent testing revealed to be cocaine. Tr. 103, 106. Ex. 1. The other baggies contained "blue pills stamped M and marked 30 * * *" that appeared to be "oxyco[n]tin or oxycodone." Tr. 103. However, subsequent testing revealed these blue pills to be composed of fentanyl that had been pressed into the shape of oxycontin. Tr. 109-110.

{¶5} On April 2, 2020, Silvas was indicted on one count of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(2), a felony of the first degree; and on one count of possession of drugs in violation of R.C. 2925.11(A)(1), a felony of the fifth degree. Doc. 1. The count of aggravated trafficking in drugs carried three specifications: that Silvas was "a major drug offender"; that Silvas "used a 2005 Acura * * * in the commission or facilitation of the offense; and that the

-3-

$1,543.00 in Silvas's possession were "the proceeds of trafficking in drugs or other criminal activity." Doc. 1.

{¶6} On December 1, 2020, these charges were tried before a jury. Tr. 1. At trial, Silvas testified in his own defense, stating that he was driving the Acura to Fort Wayne, Indiana for a friend and that he was unaware of the concealed drugs in the vehicle. Tr. 155, 160, 168. On December 2, 2020, the jurors found Silvas guilty of both charges against him. Doc. 113. The jury also found that Silvas was a major drug offender and that he had used the 2005 Acura in the commission of this offense. Doc. 113. However, the jury did not find that the $1,543.00 in Silvas's possession were the proceeds of drug trafficking or other criminal activity. Doc. 113.

{¶7} On January 19, 2021, the trial court issued its judgment entry of sentencing. Doc. 133. For his conviction of aggravated trafficking in drugs, the trial court sentenced Silvas "to serve an indefinite term of imprisonment * * * of a mandatory eleven (11) years minimum to sixteen and one-half (16.5) years maximum." Doc. 133. For his conviction for possession of drugs, the trial court imposed a prison term of twelve months to be served concurrently with his prison sentence for aggravated trafficking in drugs. Doc. 133.

{¶8} Silvas filed his notice of appeal on February 17, 2021. Doc. 149. On appeal, he raises the following four assignments of error:

**First Assignment of Error**

**Cesar Silvas's drug convictions for aggravated trafficking and possession are not supported by the manifest weight of the evidence.**

**Second Assignment of Error**

**Cesar Silvas's drug convictions for aggravated trafficking and possession are not supported by sufficient evidence, and the trial court erred when it denied his Crim.R. 29 motion.**

**Third Assignment of Error**

**Ohio's sentencing scheme of potentially enhanced penalties for qualifying first and second degree felonies as administratively determined by the Department of Rehabilitation and Correction, which was applied to Cesar Silvas, is unconstitutional.**

**Fourth Assignment of Error**

**The trial court erred when it prohibited a sentence reduction for Cesar Silvas based upon a 'sexually-oriented-offense' conviction.**

For the sake of analytical clarity, we will consider Silvas's second assignment of error before we consider his first assignment of error.

*Second Assignment of Error*

{¶9} Silvas argues that his convictions for aggravated trafficking in drugs and possession of drugs are not supported by sufficient evidence.

Legal Standard

{¶10} A challenge to the sufficiency of the evidence supporting a conviction "is a question of law and a 'test of adequacy rather than credibility or weight of the evidence.'" *State v. Beaver*, 3d Dist. Marion No. 9-17-37, 2018-Ohio-2438, ¶ 40,

quoting *State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19. "The sufficiency-of-the-evidence analysis addresses the question of whether adequate evidence was produced for the case to be considered by the trier of fact and, thus, whether the evidence was 'legally sufficient to support the verdict * * *.'" *State v. Luebrecht*, 3d Dist. Putnam No. 12-18-02, 2019-Ohio-1573, ¶ 36, quoting *State v. Worthington*, 3d Dist. Hardin No. 6-15-04, 2016-Ohio-530, ¶ 12. On appeal, the applicable standard

> **is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.**

*State v. Brown*, 3d Dist. Hancock No. 5-17-19, 2018-Ohio-899, ¶ 27, quoting *State v. Plott*, 2017-Ohio-38, 80 N.E.3d 1108, ¶ 62 (3d Dist.).

{¶11} To prove the offense of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(2), the State must establish that the offender

> **[1] knowingly * * * [2] prepare[d] for shipment, ship[ped], transport[ed], deliver[ed], prepare[d] for distribution, or distribute[d] [3] a controlled substance or a controlled substance analog, [4] when the offender kn[ew] or ha[d] reasonable cause to believe that the controlled substance or controlled substance analog [was] * * * intended for sale or resale by the offender or another person.**

R.C. 2925.03(A)(2). To prove the offense of possession of drugs in violation of R.C. 2925.11(A), the State must establish that the offender "[1] knowingly [2]

-6-

obtain[ed], possess[ed], or use[d] [3] a controlled substance or a controlled substance analog." R.C. 2925.11(A).

{¶12} "The issue of whether a person charged with drug possession knowingly possessed a controlled substance 'is to be determined from all the attendant facts and circumstances available.'" *State v. Brooks*, 3d Dist. Hancock No. 5-11-11, 2012-Ohio-5235, ¶ 45, quoting *State v. Teamer*, 82 Ohio St.3d 490, 492, 696 N.E.2d 1049 (1998). R.C. 2901.22 defines knowingly as follows:

> **A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.**

R.C. 2901.22(B).

{¶13} R.C. 2925.01(K) defines "possession" as "having control over a thing or substance * * *." R.C. 2925.01(K). However, this provision further states that possession "may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K).

> **Possession of drugs can be either actual or constructive. [*State v.*] *Cooper*[, 3d Dist. Marion No. 9-06-49, 2007-Ohio-4937,] * * * ¶ 25. *See also State v. Wolery*, 46 Ohio St.2d 316, 329[, 348 N.E.2d 351] (1976), certiorari denied, 429 U.S. 932, 97 S.Ct. 339; *State v. Haynes*, 25 Ohio St.2d 264[, 267 N.E.2d 787] (1971). "A person**

> has 'actual possession' of an item if the item is within his immediate physical possession." *State v. Williams*, 4th Dist. No. 03CA2736, 2004-Ohio-1130, ¶ 23 citing *State v. Fugate*, 4th Dist. [Washington] No. 97CA2546[, 1998 WL 729221] (Oct. 2, 1998). A person has 'constructive possession' if he is able to exercise domination and control over an item, even if the individual does not have immediate physical possession of it. *State v. Hankerson*, 70 Ohio St.2d 87[, 434 N.E.2d 1362] (1982), syllabus; *Wolery, supra*. For constructive possession to exist, '[i]t must also be shown that the person was conscious of the presence of the object.' *Hankerson*, 70 Ohio St.2d at 91.

*State v. Bustamante*, 3d Dist. Seneca Nos. 13-12-26 and 13-13-04, 2013-Ohio-4975, ¶ 25. The prosecution can establish constructive possession of a controlled substance "by circumstantial evidence alone." *Bustamente* at ¶ 25.

> 'Absent a defendant's admission, the surrounding facts and circumstances, including the defendant's actions, are evidence that the trier of fact can consider in determining whether the defendant had constructive possession.' *State v. Voll*, 3d Dist. Union No. 14-12-04, 2012-Ohio-3900, * * * ¶ 19 * * *.

(Citations omitted.) *State v. Frye*, 2018-Ohio-894, 108 N.E.3d 564, ¶ 51 (3d Dist.).

{¶14} "Although a defendant's mere proximity to drugs is in itself insufficient to establish constructive possession, proximity to the drugs may constitute some evidence of constructive possession." *State v. Brown*, 4th Dist. Athens No. 09CA3, 2009-Ohio-5390, ¶ 20. However, a defendant's

> presence in the vicinity of contraband, coupled with another factor or factors probative of dominion or control over the contraband, may establish constructive possession. [*State v.*] *Riggs*[, 4th Dist. Washington No. 98CA39, 1999 WL 727952] *5 [(Sept. 13, 1999)]. For example, in the automobile context a defendant's 'possession of the keys to the automobile is a strong indication of control over the automobile and all things found in

**or upon the automobile.' [*State v.*] *Fry*[, 4th Dist. Jackson No. 03CA26, 2004-Ohio-5747,] \* \* \* ¶ 41. 'Thus, when one is the driver of a car in which drugs are within easy access of the driver, constructive possession may be established.' *Id.*, citing *State v. Morehouse* (Oct. 19, 1989), Cuyahoga App. No. 56031, 1989 WL 125128. In addition, 'furtive movements in an automobile may provide sufficient indicia of dominion or control over contraband, allowing an inference of constructive possession.' *Riggs* at \*5.**

*Id. See State v. McClain*, 2020-Ohio-1436, 153 N.E.3d 854, ¶ 46 (3d Dist.).

Legal Analysis

{¶15} Silvas argues that the State did not prove that he knowingly possessed the cocaine and fentanyl that was concealed in the Acura that he was driving. Officer Jennings testified that he smelled marijuana when Lugo opened the car door and found marijuana in the ashtray. Tr. 96, 101. Silvas admitted to the police that this marijuana belonged to him. Tr. 139, 145. *See* Tr. 162. However, he did not admit to owning or even knowing about the cocaine or the fentanyl that was in the Acura. Tr. 139, 159. The State argues that the evidence produced at trial establishes that Silvas had constructive possession of the cocaine and fentanyl. We turn now to examining the evidence presented by the State at trial.

{¶16} Officer Jennings noted that Silvas did not stop for almost a mile after he (Officer Jennings) had activated the lights on his police cruiser. Tr. 95, 121. He then testified that, at the time of the traffic stop, Silvas was found to have $1,543.00 in cash on his person while Lugo had $1,595.00 in cash. Tr. 100. Officer Jennings

stated that this was significant, in his experience, because "nowadays drug dealers don't use debit cards or check, it's always in cash." Tr. 100.

{¶17} After the police searched Silvas and Lugo, they began a search of the Acura. Tr. 101. Officer Jennings testified that he discovered four baggies under the "carpet on the passenger side floorboard * * *." Tr. 101. He stated that he had

> **noticed some plastic debris on the passenger side floorboard, which to me, my training indicates, if anyone pulls off a door panel or carpet of any kind of plastic piece, they're not metal, they're actually pieces of plastic rivets and those break very, very easily.**
>
> **When I noticed those, I began looking in the natural cavities of the vehicle. I typically start with the center console. I'll pull the slides out. Then I went to the carpet on the passenger side floorboard, pulled the carpet back, and the insulation was moved to the sides and the insulation by the floorboard there was four baggies.**
>
> **\* \* \***
>
> **Typically they use the dash. If you pull out the screws in a dashboard, there's places in the dash that are—just have natural voids where it's just a natural space you can put, actually, large quantities of narcotics in those—in those cavities.**
>
> **And basically when you have the floorboard on the passenger side, it sweeps down which in the corners there's a natural cavity where they—they place the insulation for sound dampening. But you won't have that on the driver's side because of the pedals. So it's typically on the driver's side. So it's typically on the driver's [sic] side.[1]**

---

[1] Officer Jennings appears to have misspoken by saying "driver's side." Tr. 102. The context indicates that the typical hiding spaces are the natural cavities in vehicles. Tr. 102. His testimony indicates that one such natural cavity exists under the passenger's side floorboard but not the driver's side floorboard.

Tr. 101-102. One of the baggies contained a white powder that appeared to be cocaine. Tr. 102-103. The other baggies contained over 1,600 blue pills that appeared to be oxycontin. Tr. 102-103, 106. Ex. 1-3. Officer Jennings stated that he has seen "quite a bit of oxycontin on the interstate back and forth." Tr. 102.

{¶18} Subsequent testing confirmed that the baggie with the white powder contained five grams of cocaine. Tr. 106. However, testing revealed the blue pills to be composed of fentanyl not oxycontin. Tr. 106. Officer Jennings testified that the pills found in the Acura had the same markings as an oxycontin pill: "one side's M, one side's 30, round in shape and bluish in color." Tr. 109. He stated that fentanyl, "when it's manufactured illegally, it's in a powder form, tan or * * * light on occasion." Tr. 110. For fentanyl to appear as an oxycontin pill,

> **[y]ou'd have to change the color of the fentanyl, put it into a pill press, somehow made in the same shape, size, and markings as the oxycontin pill. So they had to get the powder, change the color, get a pill press itself with stamps same as the oxycontin.**

Tr. 110. Ex. 2-3. Officer Jennings explained why drug traffickers would want to make fentanyl appear to be oxycontin:

> **Typically fentanyl right now is going anywhere from three to five dollars a unit dose on the street. Oxycontin pills are goin' for roughly a dollar a milligram. So that one pill on the street for oxycontin is roughly $30 compared to if it was just the basic fentanyl, which it should have been, would have been roughly three to five dollars.**

Tr. 110. Officer Jennings then stated that, based on these figures, the fentanyl found in the Acura "would have been worth roughly $15,000" if it had been sold as fentanyl. Tr. 111.

{¶19} However, if these fentanyl pills were presented and sold as oxycontin, then the pills discovered in the Acura would have a "$50,000 street value * * *." Tr. 111. Based on the fact that a large quantity of fentanyl was made to look like oxycontin, Officer Jennings concluded that "they were trying to sell it as oxycontin for more of a profit, than just basically selling it * * * in the fentanyl form for less money." Tr. 113. He stated that, if the fentanyl had been intended for personal use, "it's gonna be in the—in the original form how it was made from the chemist, which is gonna be a white or tan powder, not stamped into an oxycontin tablet." Tr. 113.

{¶20} Officer Jennings also affirmed that it was significant that there were two people in the Acura. Tr. 114. He explained that

> **[in] my experience, even some of our local people that go down and purchase somewhat larger quantities of narcotics, I * * * typically see two or four in the vehicle. That's typically for * * * protection, safety * * * for the individuals. Something like this would be the same thing. Two or more people in the vehicle for security, protection, and also verification that maybe the drugs made it to the location.**

Tr. 114. Officer Jennings also noted that the driver's license that had been given to him by Silvas was examined later and found to be a fake identification card. Tr. 98.

{¶21} While Silvas told the police that he was driving to Fort Wayne to trade the Acura for another vehicle, Officer Jennings stated that there was no title found

in the vehicle. Tr. 116. He explained that, if the Acura was to be sold in Fort Wayne, a title transfer would have been necessary to effectuate the sale. Tr. 116. Officer Jennings also noted that the Acura was filled with "debris, marijuana odor, trash, used bottles, baby [t]issues * * *." Tr. 116. Ex. 5. Based on the condition of the vehicle, he said, "I don't think anyone was actually selling that vehicle." Tr. 116. He also stated that there was "a baby stroller in the trunk * * *." Tr. 116.

{¶22} When asked if any other items of interest were found during the search of the Acura, Officer Jennings gave the following response:

> **Ther were tools, odd tools, like I said, there were—just some issues that stuck out for us were some of the tools in the vehicle. A fuse tester that was—the polarities were actually reversed and [in] my experience a lot of time those are actually used for hidden compartments. * * ***

> **\* \* \***

> **There was a polarity tester in the vehicle. Basically you use it for bolt testing. If you touch a certain—a live wire of something to see if the voltage is live or not, they're actually reversed, which— which in our experience and my training, they're actually used for hidden compartments.**

> **If you actually touch a certain bolt to a different area, a compartment may release.**

Tr. 117. He also stated that they discovered "Cigarillo packs" in the Acura. Tr. 101. Officer Jennings explained that people will often "take out the tobacco, and then put in marijuana" to make "marijuana blunts." Tr. 101.

**{¶23}** Officer Jennings stated that those involved in trafficking commonly "use rental cars or someone else's vehicle because they assume those vehicles cannot be seized or forfeited for trafficking." Tr. 129. He testified that the owner of the Acura was "[a] female in Cincinnati." Tr. 129. Officer Jennings stated that the police and the Drug Enforcement Administration attempted to contact the owner of the Acura but that they were not able to reach her. Tr. 130.

**{¶24}** Detective Brown testified that Silvas spoke very little English and that they needed to use an interpreter to communicate with him. Tr. 134. During a police interview, Silvas indicated that

> **they [Silvas and Lugo] were coming from Cincinnati, they were traveling to Fort Wayne, Indiana to trade the current vehicle they were in for another vehicle. He [Silvas] said they were gonna drive to a gas station and meet an individual to trade their vehicle, that they were driving for a vehicle that the unknown individual had. They were gonna give that individual three thousand dollars cash, and then they were gonna drive that vehicle back.**

Tr. 136. Silvas also told Detective Brown that his cousin was the owner of the Acura that he was driving. Tr. 136.

**{¶25}** Having reviewed the evidence in a light most favorable to the prosecution, we conclude that a reasonable trier of fact could find that Silvas had constructive possession of the cocaine and fentanyl that was discovered in the Acura that he was driving. Thus, Silvas has not carried the burden of demonstrating that his convictions for aggravated trafficking in drugs and possession of drugs are not supported by sufficient evidence. His second assignment of error is overruled.

-14-

*First Assignment of Error*

**{¶26}** Silvas argues that his convictions for aggravated trafficking in drugs and possession of drugs are against the manifest weight of the evidence.

Legal Standard

**{¶27}** "When 'deciding whether a conviction is against the manifest weight of the evidence, an appellate court determines whether the state has appropriately carried its burden of persuasion.'" *Brown*, 2018-Ohio-899, *supra*, at ¶ 8, quoting *State v. Blanton*, 121 Ohio App.3d 162, 169, 699 N.E.2d 136 (3d Dist. 1997). "In a manifest weight analysis, 'the appellate court sits as a "thirteenth juror" * * *.'" *State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 17, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

**{¶28}** Appellate courts "must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Brentlinger*, 2017-Ohio-2588, 90 N.E.3d 200, ¶ 36 (3d Dist.), quoting *Thompkins* at 387.

**{¶29}** "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *State v. Sullivan*, 2017-Ohio-8937, 102 N.E.3d 86, ¶ 38 (3d Dist.), quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "[I]t

is well established that the * * * credibility of the witnesses [is] primarily a matter for the trier of fact." *State v. Gervin*, 2016-Ohio-8399, 79 N.E.3d 59, ¶ 142 (3d Dist.), quoting *State v. Clark*, 101 Ohio App.3d 389, 409, 655 N.E.2d 795 (8th Dist. 1995). "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 27 (3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

Legal Analysis

{¶30} We reincorporate the evidence that was examined under the second assignment of error and proceed to examining the evidence on the basis of its weight and credibility. On cross-examination, Detective Brown stated that Silvas admitted to owning the marijuana that Officer Jennings found in the Acura but stated that "he didn't know anything about the pills." Tr. 140. He also testified that he did not find any weapons on Silvas. Tr. 143. Detective Brown stated that cell phones are, in his experience, often involved in the process of drug trafficking and that he could not remember whether he found a cell phone in Silvas's possession. Tr. 144.

{¶31} On cross-examination, Detective Jennings stated that Silvas did not try to escape during the traffic stop and did not make any aggressive or furtive movements. Tr. 121-122. He testified that it was common to find weapons with those who are engaged in drug trafficking but that no weapons were found on Silvas or in the Acura. Tr. 122. Officer Jennings stated that he also did not find a cell

phone on Silvas's person, even though such devices are commonly used in drug trafficking. Tr. 127. He then testified that trafficking in oxycontin generally moves "southbound from Detroit" and acknowledged that Silvas had been found heading northbound with oxycontin. Tr. 125-126. He confirmed that the baggies of cocaine and fentanyl were not examined for fingerprints or traces of DNA. Tr. 124.

{¶32} At trial, Silvas testified in his own defense. Tr. 153. He stated that he moved to Cincinnati in January of 2020 but that he had not entered the country legally. Tr. 153-154. He stated that he lived in Cincinnati with his wife's cousin, Michelle, and Michelle's husband, Alejandro Carrillo ("Carrillo"). Tr. 153-154, 164. Silvas testified that he was driving the Acura from Cincinnati to Fort Wayne as a favor for Carrillo. Tr. 162. He stated that Carrillo

> **asked me to do him a favor that day; and because he let me stay at his house, he asked me to and so I trusted him; and he asked me to do that favor and I felt that I had to do it for him. Without knowing that that [the drugs] was there.**

Tr. 162. While Silvas admitted that the marijuana belonged to him, he stated that the cocaine and fentanyl did not belong to him; that he had no knowledge that the cocaine and fentanyl was in the Acura; and that he had not even seen the cocaine and fentanyl before the police had discovered the baggies. Tr. 158-160, 162.

{¶33} Silvas further stated that he had earned the money in his pocket from his work and that he did not have a bank account into which he could deposit these funds. Tr. 160. He testified that he was not a member of a gang but worked in

gardening and floor installation. Tr. 157, 158. Silvas stated that he did not have a prior criminal record but admitted that he had been deported in the past. Tr. 154-155. Silvas also admitted that he gave a fake identification card to the police; that the name on the fake identification card belonged to a person who works in Arizona; and that he only had a valid driver's license in Mexico. Tr. 156-157.

{¶34} Silvas testified that the Acura he was driving was owned by Carrillo but that the Acura was in Michelle's name. Tr. 158, 159, 164. When asked about why the Acura was registered to a person named Rachael, Silvas replied that Michelle had two names; that her second name was Rachael; and that he did not know Michelle's last name. Tr. 161, 164-165. He stated that he knew Lugo through Carrillo and that he had only known Lugo for four days before his trip to Fort Wayne. Tr. 155.

{¶35} Silvas then explained the reason for his trip from Cincinnati to Fort Wayne. Tr. 161-162. He stated that Carrillo told him to accompany Lugo to Fort Wayne. Tr. 180. They were going to meet someone in Fort Wayne who was supposed take the Acura. Tr. 161-162. However, Silvas did not know who he was going to meet. Tr. 161-162. He said that the meeting was to occur at a gas station but that he did not know which gas station. Tr. 162. Silvas testified that the person they were meeting was supposed to call Lugo while they were traveling and was supposed to give them directions to the meeting place at that time. Tr. 162.

{¶36} On cross examination, Silvas further explained the reason that he and Lugo were driving to Fort Wayne, saying that they "were going to drop that car off and pick up another one and go back" to Cincinnati. Tr. 167. After Silvas indicated that he did not know who he was meeting or where this planned meeting was to take place, the following exchange then occurred:

> **[Prosecutor:] So you're telling this jury * * * that you were given a car to drive to the entry—the entrance of Fort Wayne * * *, you're to meet an individual * * *, you had no description for the individual * * *, you do not know what gas station it was, you do not know what road it [the gas station] was [on], all these things are true?**
>
> **[Silvas:] Yes.**

Tr. 170. While Silvas had stated that Carrillo did not pay him to drive to Fort Wayne, he did testify that Carrillo offered to sell him the car that was to be picked up in Fort Wayne for $3,000.00 if he (Silvas) liked the car. Tr. 177. While he did not have $3,000.00, Silvas stated that Carrillo told him "that money could be lent." Tr. 177. Silvas referred to this offer as "a deal * * *." Tr. 176.

{¶37} Silvas was aware that Lugo had pled guilty to trafficking in drugs, but Silvas maintained that he did not put the drugs into the Acura and was not informed by Carrillo or Lugo that there were drugs in the Acura. Tr. 180-181. He then testified that Michelle was twenty-six or twenty-seven years old. Tr. 172. Silvas stated that he was "160 something" centimeters and that Michelle was slightly shorter than he was. Tr. 172. The prosecution asked if Michelle's height was

comparable to the interpreter in the room, who was "five foot eight" inches. Tr. 172. Silvas stated that Michelle was "a little bit shorter." Tr. 173.

{¶38} Officer Jennings was then called as a rebuttal witness. Tr. 183. He testified that the Acura was registered to a Rachael Cano Madrigal ("Madrigal"). Tr. 184. Officer Jennings attempted to contact Madrigal but was not able to reach her. Tr. 186. He also stated that the Drug Enforcement Administration was not able to reach the owner of the Acura. Tr. 186. The registration information indicated that Madrigal was "five foot, 1 inches" and "22 years of age at the time of the stop." Tr. 184-185. He testified that no picture was on file of the registered owner of the Acura. Tr. 185.

{¶39} In conclusion, there is no indication in the record that the jury clearly lost its way and returned a verdict that was against the manifest weight of the evidence. Even though Silvas's testimony contradicted the State's theory of the case, the jurors, as the triers of fact, were "free to believe or disbelieve any or all of the testimony presented." *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, 922 N.E.2d 248, ¶ 34 (10th Dist.). Further, having reviewed the materials in the record, we conclude that the evidence presented at trial does not weigh heavily against Silvas's convictions. Thus, his first assignment of error is overruled.

*Third Assignment of Error*

{¶40} Silvas asserts that the Reagan Tokes Law under which he received an indefinite sentence is unconstitutional.

Legal Standard

**{¶41}** Under Crim.R. 52(A), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B).

> **"In order to find plain error under Crim.R. 52(B), there must be an error, the error must be an 'obvious' defect in the trial proceedings, and the error must have affected 'substantial rights.'"** *State v. Bowsher*, 3d Dist. Union No. 14-07-32, 2009-Ohio-6524, ¶ 12, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). 'The standard for plain error is whether, but for the error, the outcome of the proceeding clearly would have been otherwise.' *State v. Hornbeck*, 155 Ohio App.3d 571, 2003-Ohio-6897, 802 N.E.2d 184, ¶ 16 (2d Dist.), citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978). Notice of plain error is taken "only to 'prevent a manifest miscarriage of justice.'" *State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 23, quoting *Long*, *supra*, at paragraph three of the syllabus.

*State v. Taflinger*, 3d Dist. Logan No. 8-17-20, 2018-Ohio-456, ¶ 17. Under Crim.R. 52(B), "the *defendant* bears the burden of demonstrating that a plain error affected his substantial rights." (Emphasis sic.) *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 14.

**{¶42}** Further, "[i]n order to be justiciable, a controversy must be ripe for review." *State v. Loving*, 180 Ohio App.3d 424, 2009-Ohio-15, 905 N.E.2d 1234, ¶ 4, quoting *Keller v. Columbus*, 100 Ohio St.3d 192, 2003-Ohio-5599, 797 N.E.2d 964, ¶ 26.

> Ripeness 'is peculiarly a question of timing.' *Regional Rail Reorganization Act Cases* (1974), 419 U.S. 102, 140, 95 S.Ct. 335, 357, 42 L.Ed.2d 320, 351. The ripeness doctrine is motivated in

**part by the desire "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies * * *."  *Abbott Laboratories v. Gardner* (1967), 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681, 691 [(reversed on other grounds in *Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977))]. * * *.**

**"The basic principle of ripeness may be derived from the conclusion that 'judicial machinery should be conserved for problems which are real or present and imminent, not squandered on problems which are abstract or hypothetical or remote.' * * * [T]he prerequisite of ripeness is a limitation on jurisdiction that is nevertheless basically optimistic as regards the prospects of a day in court: the time for judicial relief is simply not yet arrived, even though the alleged action of the defendant foretells legal injury to the plaintiff."  Comment, Mootness and Ripeness: The Postman Always Rings Twice (1965), 65 Colum. L.Rev. 867, 876.**

*State ex rel. Elyria Foundry Co. v. Indus. Comm.*, 82 Ohio St.3d 88, 89, 1998-Ohio-366, 694 N.E.2d 459, 460 (1998).  "A claim is not ripe for our consideration if it rests on contingent future events that may not occur as anticipated or may never occur at all."  *Loving* at ¶ 4, citing *Texas v. U.S.*, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998).

Legal Analysis

{¶43} Silvas did not challenge the constitutionality of the Reagan Tokes Law before the trial court.  For this reason, we apply the plain error standard in this case.  Silvas raises three arguments against the Reagan Tokes Law.  First, Silvas asserts that the Reagan Tokes Law violates his right to a trial by jury because he could be held beyond his presumptive release date for violations that were not tried before a

-22-

jury. In *State v. Crawford*, this Court considered the exact same argument. *State v. Crawford*, 3d Dist. Henry No. 7-20-05, 2021-Ohio-547, ¶ 14-15. In that case, we concluded that the Crawford's

> **arguments about his right to a trial by jury revolve around whether he could, at some date in the future, be kept past his presumptive release date for various violations that he may or may not commit.**
>
> **At this point, we cannot know if Crawford will commit violations that might prompt an ODRC hearing to decide whether to hold him past his presumptive release date. This argument does not address a penalty that Crawford has already received but is based on contingent events that may or may not arise in the future. Thus, this issue is not yet ripe for our consideration. As such, we decline to review this issue at this time.**

*Id.* at ¶ 14-15. Turning to the case presently before this Court, we apply the reasoning of *Crawford* and decline to address these arguments at this time because they are not ripe for review. *Id.*

{¶44} Second, Silvas argues that the Reagan Tokes Law unconstitutionally violates the separation of powers. However, in *State v. Hacker*, this Court joined the Second and Twelfth Districts in holding that the Reagan Tokes Law did not run afoul of the separation of powers. *State v. Hacker*, 2020-Ohio-5048, 161 N.E.3d 112 ¶ 7 (3d Dist.). *See State v. Barnes*, 2d Dist. Montgomery No. 28613, 2020-Ohio-4150, ¶ 32; *State v. Guyton*, 12th Dist. Butler No. CA2019-12-203, 2020-Ohio-3837, ¶ 17.[2] At this time, we decline to revisit our prior precedent. Thus,

---

[2] We note that the Fourth, Fifth, Sixth, and Eleventh Districts found that separation of powers arguments and due process arguments that question the constitutionality of the Reagan Tokes Law are not yet ripe for review.

turning to the facts of the case presently before this Court, we conclude that Silvas's arguments about the separation of powers are without merit.

{¶45} Third, Silvas argues that the Reagan Tokes Law violates constitutional rights to due process by failing to provide for "(1) adequate notice that is not vague, (2) adequate parameters on executive branch discretion, and (3) adequate guarantees for a fair hearing." Appellant's Brief, 11. Silvas notes, in his brief, that he is challenging the Reagan Tokes Law "both facially and as applied." *Id*. at 12. In *State v. Kepling*, we considered these same arguments. *State v. Kepling*, 3d Dist. Hancock No. 5-20-23, 2020-Ohio-6888, ¶ 10-11. Kepling raised two main classes of due process arguments against the Reagan Tokes Law. *Id*. at ¶ 10.

> **In the first class of arguments, Kepling argue[d] that the text of the Reagan Tokes Law does not provide sufficient procedural due process protections for subject offenders. In the second class of arguments, Kepling argue[d] that his due process rights are not guaranteed protection in the future and may be violated by the ODRC [Ohio Department of Rehabilitation and Correction].**

*Id*. at ¶ 10. As to the first class of arguments, we relied on *Hacker* and determined that the Reagan Tokes Law did not, on its face, violate constitutional due process rights. *Kepling* at ¶ 11, citing *Hacker* at ¶ 18, 23.

---

*See State v. Ramey,* 4th Dist. Washington Nos. 20CA1 and 20CA2, 2020-Ohio-6733, ¶ 22 *State v. Downard*, 5th Dist. Muskingum No. CT2019-0079, 2020-Ohio-4227, ¶ 5, 12-13; *State v. Velliquette*, 6th Dist. Lucas No. L-19-1232, 2020-Ohio-4855, ¶ 30; *State v. Lavean*, 11th Dist. Lake No. 2020-L-045, 2021-Ohio-1456, ¶ 12. We also note that, on December 28, 2020, the Supreme Court of Ohio accepted a case to determine whether the constitutionality of the Reagan Tokes Law is ripe for review. *State v. Maddox*, 160 Ohio St.3d 1505, 2020-Ohio-6913, 159 N.E.3d 1150.

**{¶46}** In the second class of arguments, Kepling went beyond the text of the Reagan Tokes Law and asserted the "his due process rights might not be properly protected were the indefinite sentencing provisions to be applied "at some future date." *Kepling* at ¶ 13. We stated the following:

> **at this point, we cannot even determine whether the ODRC will ever have occasion to hold a hearing to determine whether Kepling should be held beyond his presumptive release date. Similarly, we cannot now determine whether the ODRC will provide Kepling with adequate notice and an opportunity to be heard if a hearing to hold Kepling beyond his presumptive release date is ever held.**

*Id*. at ¶ 14. We then concluded that Kepling's arguments were not ripe for review as they "rest[ed] on contingent future events that may not occur as anticipated or may never occur at all." *Kepling* at ¶ 15, quoting *Loving, supra*, at ¶ 4.

**{¶47}** Turning to the case presently before us, we follow *Kepling* and *Hacker* to hold that the facial due process challenges raised by Silvas against the Reagan Tokes Law are without merit. *Kepling* at ¶ 11, citing *Haker, supra*, at ¶ 18, 23.[3] Applying our precedent in *Kepling*, we decline to review the as applied due process challenges raised by Silvas against the Reagan Tokes Law because these arguments are not yet ripe for review. Thus, in these three arguments, Silvas has not carried the burden of demonstrating plain error. As such, his third assignment of error is overruled.

---

[3] We are aware that the Eight District found that the Reagan Tokes Law was unconstitutional because it did not contain adequate procedural due process protections. *State v. Sealey*, 2021-Ohio-1949, 173 N.E.3d 894, ¶ 45 (8th Dist.).

Case No. 17-21-03

*Fourth Assignment of Error*

**{¶48}** Silvas argues that the trial court erred in the process of imposing a prison sentence on him.

Legal Standard

**{¶49}** As a general matter, trial courts have broad discretion in imposing sentences. *State v. Purvis*, 3d Dist. Marion No. 9-20-29, 2021-Ohio-265, ¶ 9.

> **If the defendant establishes by clear and convincing evidence that his or her sentence is '(1) contrary to law and/or (2) unsupported by the record,' an appellate court has the authority, pursuant to R.C. 2953.08(G)(2), 'to increase, reduce, or otherwise modify a sentence * * *.'**

*State v. Risner*, 3d Dist. Wyandot No. 16-20-05, 2021-Ohio-342, ¶ 39, quoting *State v. McGowan*, 147 Ohio St.3d 166, 2016-Ohio-2971, 62 N.E.3d 178, ¶ 1.

> **Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.**

*Taflinger*, *supra*, at ¶ 12, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus (1954).

Legal Analysis

**{¶50}** On appeal, Silvas argues that the trial court erred by including the following language in its judgment entry of sentencing:

> **As a 'sexually oriented offenses,' the Defendant may not receive 5% to 15% earned reduction of minimum prison term credit**

> **(ERMT) for 'exceptional conduct or adjustment to incarceration.'**

Doc. 133. This language refers to a provision of the Reagan Tokes Law that is found in R.C. 2967.271(F)(1) and reads, in its relevant part, as follows:

> **The director of the department of rehabilitation and correction may notify the sentencing court in writing that the director is recommending that the court grant a reduction in the minimum prison term imposed on a specified offender who is serving a non-life felony indefinite prison term and who is eligible under division (F)(8) of this section for such a reduction, due to the offender's exceptional conduct while incarcerated or the offender's adjustment to incarceration. * * *.**

R.C. 2967.271(F)(1). In turn, R.C. 2967.271(F)(8) reads as follows:

> **Divisions (F)(1) to (6) of this section do not apply with respect to an offender serving a non-life felony indefinite prison term for a sexually oriented offense, and no offender serving such a prison term for a sexually oriented offense is eligible to be recommended for or granted, or may be recommended for or granted, a reduction under those divisions in the offender's minimum prison term imposed under that non-life felony indefinite prison term.**

R.C. 2967.271(F)(8). In this case, Silvas was neither charged with nor convicted of a sexually oriented offense. Doc. 1, 113, 115. Since Silvas was only convicted of drug offenses, R.C. 2967.271(F)(8) is not applicable in this case.

{¶51} The State argues that this section of the judgment entry was simply included as part of an explanation of the larger Reagan Tokes Law. However, this statement is plainly phrased as a stricture that is applicable to Silvas. Doc. 133. We also note that an explanation of R.C. 2967.271(F)(8) was not included as a part of the trial court's verbal explanation of the Reagan Tokes Law at Silvas's

sentencing hearing. Doc. 172. These facts suggest that the erroneous statement identified by Silvas on appeal was inadvertently included in this judgment entry of sentencing.

{¶52} In conclusion, a plain reading of the current judgment entry of sentencing applies R.C. 2967.271(F)(8) to a case in which R.C. 2967.271(F)(8) is inapplicable. Thus, Silvas has demonstrated that this portion of his sentence is clearly and convincingly contrary to law. Crim.R. 36 states that such "[c]lerical mistakes in judgments, orders, or other parts of the record * * * may be corrected by the court at any time." Crim.R. 36. "The tool utilized to correct such errors is generally a nunc pro tunc entry." *State v. Brown*, 136 Ohio App.3d 816, 819, 2000-Ohio-1660, 737 N.E.2d 1057, 1059 (3d Dist.). "A nunc pro tunc entry is permitted to correct the record to accurately reflect what happened in a hearing when a judgment entry is inaccurate." *State v. Brown*, 3d Dist. Hancock No. 5-18-25, 2019-Ohio-1696, ¶ 8. Silvas's fourth assignment of error is sustained.

*Conclusion*

{¶53} Having found no error prejudicial to the appellant in the particulars assigned and argued in the first, second, and third assignments of error, the judgment of the Shelby County Court of Common Pleas is affirmed as to these issues.

{¶54} Having found error prejudicial to the appellant in the particulars assigned and argued in the fourth assignment of error, the judgment of the Shelby County Court of Common Pleas is reversed as to these issues.

{¶55} Accordingly, this cause of action is remanded to the trial court for further proceedings that are consistent with this opinion.

> ***Judgment Affirmed in Part,***
> ***Reversed in Part,***
> ***And Cause Remanded***

**MILLER and SHAW, J.J., concur.**

**/hls**