[Cite as *State v. Luebrecht*, 2019-Ohio-1573.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PUTNAM COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

MICHAEL G. LUEBRECHT,

    DEFENDANT-APPELLANT.

CASE NO. 12-18-02

**O P I N I O N**

Appeal from Putnam County Common Pleas Court
Trial Court No. 2005-CR-47

**Judgment Affirmed**

**Date of Decision:  April 29, 2019**

APPEARANCES:

    *F. Stephen Chamberlain* **for Appellant**

    *Gary L. Lammers* **for Appellee**

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Michael G. Luebrecht ("Michael") appeals the judgment of the Putnam County Court of Common Pleas, alleging his conviction was against the manifest weight of the evidence and was not supported by sufficient evidence. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} Michael has a complicated medical history. In 1986 and 1988, Michael was hospitalized for severe depression. Tr. 446-447. In 1992, he married Amy Luebrecht ("Amy"), and they subsequently had three sons. Tr. 167, 492. In 1995, Michael was diagnosed with Obsessive Compulsive Disorder ("OCD") and began taking medications to treat this condition. Ex. 19. Tr. 448. After the birth of his first son, Michael told his doctor, in 1996, that he experienced an "urge" to harm his child. Ex. 20. Tr. 461. He later expressed fears that he would suffocate his second son in 2000. Ex. 20. Tr. 461. At trial, medical records were introduced that indicated Michael "believed that by killing [his second oldest son] as a young child he would prevent him from growing up, making the wrong choice in not following Jesus, and eventually would go to Hell." Ex. 20. Tr. 461-462.

{¶3} Shortly after his third son was born, in June of 2004, Michael's OCD began worsening. Ex. 12. Tr. 501, 916. In response, Michael's doctor began adjusting his medications in the fall of 2004 and the spring of 2005. Tr. 508. Michael stopped working in December of 2004 and was eventually hospitalized

later that month. Tr. 351, 389. During this time, Michael had suicidal urges and recurring thoughts of harming his second oldest son. Ex. 18, 20. Tr. 408. In February of 2004, he was hospitalized again after having suicidal thoughts. Tr. 509-510, 512. At this time, he indicated that he believed Satan was putting thoughts in his head and trying to direct his life. Ex. A. Tr. 396, 463.

{¶4} In February of 2004, Michael began taking Effexor XR. Ex. A. Tr. 518. His dosages of Effexor were subsequently raised over the month of March and multiple changes were made to a number of other drugs that he was taking, including Zyprexa, Trazodone, and Ativan. Ex. A. Tr. 519. On March 21, 2005, Michael began taking a drug called Wellbutrin. Ex. A. Tr. 519. In March, Michael stopped thinking about harming his second son and began having thoughts about harming his youngest son, Joel. Tr. 410-411. Michael told his doctor that he needed to be institutionalized because he was afraid that he would hurt his family. Tr. 489-490. Michael testified that he had thoughts of hurting Joel "[e]very waking moment" for the next two months. Tr. 411, 412. Eventually, he "develop[ed] the idea that this just had to be done." Tr. 412.

{¶5} On May 23, 2005, Joel, who was almost fourteen months old at this time, was being babysat by Karen Leursman ("Leursman") at her house. Ex. 12. Tr. 168, 252. At the same time, Michael was at his house. Tr. 421. He went into his bathroom and filled up his bathtub because he, in his words, "was preparing it to bring Joel home and kill[] him." Tr. 421. At roughly 1:30 P.M., Michael drove

to Leursman's house; told her that Joel had a doctor's appointment; and took Joel with him. Tr. 170, 171, 415, 418. Leursman, who had regularly babysat Joel and had known Michael for over twenty years, later testified that Michael did not seem emotional when he picked up Joel and stated that Michael had gotten "increasingly quiet" over the six months prior to this day. Tr. 166, 169, 172, 175, 187.

{¶6} When Michael got home with Joel, he took Joel into the bathroom, placed him into the bathtub, and held him under the water for two or three minutes until he drowned. Tr. 245, 421, 464. At trial, Michael said,

> **I remember walking in the bathroom. I was holding him like this, brought him in the house. (Indicating) Or I remember holding him like this, walking into the bathroom, stopping in the middle of the bathroom for one second. (Indicating) Joel said something in baby talk, and then I proceeded doing it.**
>
> **\* \* \***
>
> **I was kneeling down in front of the tub when it was happening; and when it was over, I got off my knees and stood up straight, and I stared down at him.**

Tr. 424. Michael further admitted on cross-examination that, while his son was under the water, he thought that he should "raise [Joel's] head up out of the water." Tr. 466.

{¶7} After Joel was drowned, Michael stared at his son for about fifteen seconds. Tr. 467. He then picked up Joel, put him on the bed, and called 911. Tr. 424, 467. Michael told the dispatcher that he had "drowned [his] son." Tr. 426. The dispatcher began giving Michael instructions on how to perform CPR on Joel.

Tr. 427. During this call, Michael did not seem to show emotion and did not seem to be panicked or crying. Tr. 199. Michael cooperated with the dispatcher and followed instructions over the phone. Tr. 201. One of Michael's neighbors, Jeffery Dickman ("Dickman"), overheard the dispatch and went to assist. Tr. 203. When he got to Michael's house, Dickman announced his presence and went upstairs to help. Tr. 204. According to Dickman, Michael said that Joel fell into the bathtub, though Michael testified at trial that he had no recollection of saying this. Tr. 207, 427. Shortly thereafter, the emergency medical services team arrived at Michael's house. Tr. 205.

{¶8} James Rhodes ("Rhodes"), an emergency medical services responder, arrived at Michael's house, entered the dwelling, and went into Michael's bedroom, where Joel was lying on the bed. Tr. 221. The medical team then took Joel outside, but Rhodes remained with Michael and asked him some questions. Ex. 12. Tr. 221. Rhodes noticed that there was no water in the bathtub. Tr. 221. When Rhodes asked where the water had gone, Michael told him that he had drained the water after he had drowned his son and that he had planned to do this for several weeks. Tr. 221, 224. Rhodes then went outside and told the other emergency medical services responders what Michael had said. Tr. 222. Rhodes later testified that Michael did not seem bothered by what he had done but also did not show visible signs of intoxication. Tr. 224.

{¶9} When Deputy Tony Recker ("Deputy Recker") arrived at the scene, Rhodes informed him that Michael had said that he had drowned Joel. Tr. 222-223. Deputy Recker went to Michael, who again admitted that he had drowned Joel. Tr. 234. Deputy Recker later testified that Michael seemed emotionless but did not seem disoriented or confused. Tr. 234-235, 240. As Sheriff James Beutler ("Sheriff Beutler") arrived, Deputy Recker and Rhodes were in the room with Michael. Tr. 244. Sheriff Beutler later testified that Michael, at this time, "voluntarily spoke up and said, [he] drowned [his] baby" and that he "accept[ed] full responsibility." Tr. 244-245. Sheriff Beutler then had Deputy Greg Westrick ("Deputy Westrick") Mirandize Michael. Tr. 245. Deputy Westrick took Michael to his police cruiser and asked Michael several questions. Tr. 263. Deputy Westrick later testified that Michael was responsive and calm and that he did not seem confused or emotional. Tr. 263, 292-293. When Deputy Westrick asked Michael why, of his three children, he chose to drown Joel, Michael replied that Joel "was less of a fight." Tr. 263.

{¶10} During the course of the investigation, the police found a note on the kitchen table with the following message: "Amy, I'm sorry I killed Joel. I couldn't do anything else. I'm not a man. I am a coward. ~~Joel is laying on our bed~~.[1] Here is the key to the mower. Don't let the boys have it. *Joel is at St. Ritas." Ex. 4. Tr. 310, 468. At trial, Michael testified that he did not remember writing this note,

---

[1] The note appears to have been altered to reflect the fact that Joel had been taken to the hospital by the emergency medical services team.

but he did identify the handwriting as his and admitted that he must have, therefore, written this note. Tr. 435, 468. Michael told the police that he had packed some of his clothes and had planned to flee but that he did not because he believed he would have been caught anyway. Ex. 17. Tr. 309. Shortly after Joel's death, Michael said the following to his doctor: "I was relieved at that time. It felt like a burden was lifted off of me." Ex. 20. Michael also said that he drowned Joel because he "felt [it was] the only thing [he] could do." Ex. 20.

{¶11} On May 27, 2005, Michael was charged with one count of aggravated murder in violation of R.C. 2903.01(C). Doc. 1. On June 15, 2005, Michael pled not guilty by reason of insanity. Doc. 15. However, on February 13, 2006, he withdrew his plea of not guilty by reason of insanity and changed his plea to guilty. Doc. 213. On March 7, 2006, the trial court sentenced Michael. Doc. 220.

{¶12} On April 4, 2006, Michael's doctor had him stop taking Wellbutrin. Tr. 923. On July 20, 2006, Michael's doctor had him stop taking all of his other medications, including Effexor. Tr. 928-929. In September, Michael was beginning to have more thoughts of harming others. Tr. 891, 934. Michael then told his doctor, on September 24, 2006, that he was having thoughts of harming his cellmate. Tr. 935. Two days later, Michael said to his doctor: "I'm having trouble—I'm having terrible thoughts of hurting people. They just keep getting worse." Tr. 937. Michael continued to have these homicidal ideations until the middle of November when he was placed back onto medications. Tr. 941.

{¶13} On November 15, 2016, Michael filed a motion to withdraw his guilty plea. Doc. 236. This motion stated that new information had emerged about the side effects of several medications that Michael had been taking for his mental health issues at the time of his son's death. Doc. 236. These side effects included "homicidal ideation." Doc. 236. On May 5, 2017, the trial court granted Michael's motion to withdraw his guilty plea. Doc. 252. This case proceeded to trial on January 2, 2018. Tr. 1.

{¶14} At trial, Michael explained his actions in the following way:

> **[T]here was a thing in my mind where it said there was a mission and the mission was to kill Joel and the mission had to be accomplished. There was no option.**

Tr. 413. He also testified that he felt as though he was in a "trance" on the day of Joel's death but that he was still able to remember filling up the bathtub on the morning of May 23, 2015; picking Joel up from Leursman's house; driving Joel home; drowning Joel in the bathtub; and calling 9-1-1. Tr. 415, 421, 423, 424, 465.

{¶15} According to medical records referenced at trial, Michael, as an inmate, told his psychologist that "his crime was premeditated and he might have done it to escape from his situation at that time." Tr. 942. During his testimony, Michael said that he did not remember making this statement; that he had no reason to dispute the accuracy of this medical record; and that his psychologist may have added the word "premeditated." Tr. 475, 479. He also testified that he was not

thinking about whether his actions were wrong at the time he was drowning his son. Tr. 465.

{¶16} On cross-examination, Michael admitted that he lied to the babysitter about Joel having a doctor's appointment and that he had lied to his wife about his homicidal ideations. Tr. 473, 474. He further admitted that he asked for an attorney after he was taken into police custody because he realized that this was a serious legal matter. Tr. 471. Michael also testified that he did not have thoughts about harming others on his current medicinal regimen. Tr. 436-437.

{¶17} The Defense called Dr. Peter R. Breggin ("Dr. Breggin") as an expert witness. Tr. 556, 611. Dr. Breggin called this case a "perfect storm" because of the abrupt and frequent changes that were made to Michael's medicinal regimen. Tr. 612. In particular, Dr. Breggin's analysis focused on two antidepressants that Michael was taking in 2005: Wellbutrin and Effexor. Tr. 747. At trial, Dr. Breggin read the potential side effects of Wellbutrin, which included "psychosis, hallucinations, paranoia, delusions, homicidal ideation, aggression, hostility, agitation, anxiety, and panic, as well as suicidal ideation * * *." Ex. F. Tr. 634, 665. The side effects for Effexor included the occurrence of suicidal thoughts and behaviors. Ex. AA. Tr. 671.

{¶18} In his professional opinion, Dr. Breggin believed that Michael was suffering from delusions and was psychotic. Tr. 646. At the end of his testimony, he stated the following:

> **[T]he evidence points to the fact that Mike was not under his own control. His emotions weren't working, he was flat, he was apathetic. He was on a mission. He was psychotic. He was not able to conform his way of acting to the requirements of the law or even his own morality * * * and that this was caused by combinations of drugs and then in particular that very heavy dose of the two drugs [Wellbutrin and Effexor] leading up to the event itself * * *.**

Tr. 731-732. Dr. Breggin concluded that this state was one of "involuntary intoxication." Tr. 732.

{¶19} In response, the State called two psychiatrists as expert witnesses. Dr. Thomas Sherman ("Dr. Sherman") conducted a mental status evaluation of Michael in 2005. Tr. 826, 828. In 2005, Dr. Sherman found that Michael "had suffered no mental disease or defect at the time that was so severe that it prevented him from knowing the wrongfulness of his acts." Tr. 841. He did not find any evidence of "confusion, disorientation." Tr. 845. Subsequently, Dr. Sherman met with Michael twice in 2017 to conduct further evaluations. Tr. 831. He testified that the antidepressants that Michael was taking could not cause intoxication and that a person could have certain psychotic symptoms without meeting the legal standard for involuntary intoxication. Tr. 839, 842.

{¶20} Further, Dr. Sherman testified that he did not believe that Michael suffered from delusions or command hallucinations but may have had some intrusive thoughts. Tr. 871. He stated that there was no evidence that the Wellbutrin or Effexor affected Michael's ability to appreciate the criminality of his actions. Tr.

843. He also pointed to the fact that Michael continued to have homicidal ideations after he was in prison and after he had stopped taking Wellbutrin and Effexor. Tr. 855, 891. In his conclusion, Dr. Sherman stated that the idea that Michael was involuntarily intoxicated was "preposterous." Tr. 891.

{¶21} Dr. Douglas Beech ("Dr. Beech") conducted an interview with Michael in November of 2017 and reviewed Michael's medical history. Tr. 898. Dr. Beech testified that the antidepressants that Michael was on would not have caused intoxication. Tr. 948. He also stated that Michael's medical records indicated that he had depressive symptoms, obsessive urges, and intrusive thoughts in the lead up to Joel's death. Tr. 945. At trial, Dr. Beech stated his findings on the issue of involuntary intoxication as follows:

> **There is no evidence that Mr. Leubrecht was in a state of intoxication at the time of the act. He had not ingested any intoxicating substances. He showed no signs of physical impairment, disorientation or inability to pay attention or concentrate. Those are the things we see when someone's intoxicated.**

Tr. 949-950. Dr. Beech concluded that Michael "kn[e]w the wrongfulness of the act at the time of the act"; that he "act[ed] with specific intent to produce a certain result"; and that "his intention was to bring about Joel's death." Tr. 945-947.

{¶22} The jury instructions contained an explanation of the defense of involuntary intoxication that reads, in its relevant part, as follows:

> **'Involuntary Intoxication' is an affirmative defense. * * * On this issue the burden of proof is upon the Defendant to establish by a**

-11-

> **preponderance or greater weight of the evidence that at the time in question he was so influenced by prescription drugs that he was incapable of forming a purpose to commit the offense.**

Jury Instructions, 5-6.[2] On January 5, 2018, the jury found Luebrecht guilty of the crime of aggravated murder. Doc. 351. On January 8, 2018, Luebrecht filed a Crim.R. 29 motion for acquittal. Doc. 355. The trial court denied this motion on January 8, 2018. Sentencing Hearing Tr. 4-5. The trial court then issued its judgment entry of sentencing on January 12, 2018. Doc. 361.

**{¶23}** Appellant filed his notice of appeal on February 9, 2018. Doc. 371. On appeal, Luebrecht raises the following assignments of error:

### First Assignment of Error

**Involuntary intoxication is an affirmative defense to the crime of murder and the jury erred in finding the Defendant guilty.**

### Second Assignment of Error

**The Defendant's conviction was against the manifest weight of the evidence.**

### Third Assignment of Error

**The trial court erred by not granting the Defendant's post-verdict motion for acquittal.**

For the sake of analytical clarity, we will consider the first and second assignments of error together. We will then analyze the arguments presented in the third assignment of error.

---

[2] The appellant does not challenge the content of this jury instruction on appeal.

*First and Second Assignments of Error*

**{¶24}** In his first assignment of error, Michael argues that the jury erred in finding him guilty because he met his burden of proof and established the affirmative defense of involuntary intoxication. In his second assignment of error, Michael asserts that his conviction is against the manifest weight of the evidence because he proved the affirmative defense of involuntary intoxication. We will consider these assignments of error together because Michael, in both of these arguments, asserts that he proved his affirmative defense. Further, under the applicable case law, a defendant's claim that the evidence supports his or her affirmative defense is analyzed as an argument that his or her conviction is against the manifest weight of the evidence. *State v. Johns*, 3d Dist. Seneca Nos. 13-04-23, 13-04-24, and 13-04-25, 2005-Ohio-1694, ¶ 19; *State v. Roberts*, 139 Ohio App.3d 757, 768, 745 N.E.2d 1057 (1st Dist.); *State v. Coleman*, 8th Dist. Cuyahoga No. 80595, 2002-Ohio-4421, ¶ 30; *City of Gahanna v. Cameron*, 10th Dist. Franklin No. 02AP-255, 2002-Ohio-6959, ¶ 33.

Legal Standard

**{¶25}** R.C. 2901.05(A) reads as follows:

**(A) Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused.**

R.C. 2901.05(A). In Ohio, voluntary intoxication is not an affirmative defense and "may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense." R.C. 2901.21(E). However, "[i]nvoluntary intoxication is an affirmative defense." *State v. Kortz*, 2d Dist. Montgomery No. 25041, 2013-Ohio-121, ¶ 20. *See State v. Robinson*, 47 Ohio St.2d 103, 108, 351 N.E.2d 88 (1976). Under R.C. 2901.21(F)(4), "'Intoxication' includes, but is not limited to, intoxication resulting from the ingestion of alcohol, a drug, or alcohol and a drug." R.C. 2901.21(F)(4).

{¶26} "When 'deciding whether a conviction is against the manifest weight of the evidence, an appellate court determines whether the state has appropriately carried its burden of persuasion.'" *State v. Brown*, 3d Dist. Hancock No. 5-17-19, 2018-Ohio-899, ¶ 8, quoting *State v. Blanton*, 121 Ohio App.3d 162, 169, 699 N.E.2d 136 (3d Dist. 1997). In this analysis, "an appellate court's function * * * is to determine whether the greater amount of credible evidence supports the verdict." *State v. Plott,* 2017-Ohio-38, 80 N.E.3d 1108, ¶ 73 (3d Dist.). Thus, "the appellate court sits as a 'thirteenth juror' * * *." *State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 17, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Appellate courts

> **must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest**

> **miscarriage of justice that the conviction must be reversed and a new trial ordered.'**

*State v. Brentlinger*, 2017-Ohio-2588, 90 N.E.3d 200, ¶ 36 (3d Dist.), quoting *Thompkins* at 387.

**{¶27}** "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *State v. Sullivan*, 2017-Ohio-8937, 102 N.E.3d 86, ¶ 38 (3d Dist.), quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "[I]t is well established that the * * * credibility of the witnesses [is] primarily a matter for the trier of fact." *State v. Gervin*, 2016-Ohio-8399, 79 N.E.3d 59, ¶ 142 (3d Dist.), quoting *State v. Clark*, 101 Ohio App.3d 389, 409, 655 N.E.2d 795 (8th Dist.1995). "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 27 (3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

## Legal Analysis

**{¶28}** In this case, the parties do not dispute that Michael caused the death of his son, Joel. *See* Tr. 464-466. For this reason, we will limit our analysis to the issue presented on appeal, which is whether Michael carried his burden of proving that he was involuntarily intoxicated at the time he caused his son's death. At trial, Michael stated the following about his mental state at the time of his son's death:

> **I don't think I realized what I did. I don't think I realized what happened. Like I said, I was in a daze, I was kind of confused, and—but I do remember after being in jail for about five to seven days * * * my thoughts started clearing up a little bit. Then I actually realized what happened; and then it really, it startled me.**

Tr. 431. Michael also said that drowning his son "was something [he] had to do."

Tr. 464. A statement that Michael made to a doctor after he was incarcerated was also introduced into evidence at trial and reads as follows: "It was like I was automatic, like I couldn't help myself." Tr. 875.

{¶29} On cross-examination, the following exchange occurred between Michael and the prosecution:

> **[Prosecutor]: * * * [Y]ou woke up and your mission was to kill Joel.**
>
> **[Michael]: Yeah.**
>
> **[Prosecutor]: And so that was your goal or your mission, your end result that you wanted to achieve, correct?**
>
> **[Michael]: It was the mission.**
>
> **[Prosecutor]: It was the mission.**
>
> **[Michael]: Yes.**

Tr. 464. Michael admitted that the note he left his wife stated that he was "sorry" and that this was an indication that he had done "something that someone wouldn't approve of * * *." Tr. 468. Michael also admitted that he asked for an attorney after the police arrived at his house because he understood, at that time, that this was a serious legal matter. Tr. 471.

-16-

**{¶30}** The Defense's expert, Dr. Breggin, testified that he believed that Michael was suffering from delusions and that Michael thought that Satan wanted him to drown his son. Tr. 670. He stated that the medications Michael was taking caused these delusions and that he believed Michael's OCD was not the cause of these delusions. Tr. 617. Dr. Breggin also testified that a state of psychosis would not have prevented Michael from making plans. Tr. 711-712. In his professional opinion, Dr. Breggin found that:

> **[Michael] was suffering from an involuntary intoxication, leading up to it; and at very different times he's involuntarily intoxicated, when he's hallucinating, having delusions. I mean, it comes in and out, in and out, and then it finally turns into this awful thing.**

Tr. 737-738. He concluded that Michael was "unable to resist" his "drug-induced compulsive impulses" and that Michael was psychotic because of the effects of Wellbutrin and Effexor. Tr. 746, 747.

**{¶31}** The State's first expert witness, Dr. Sherman, testified that the antidepressants that Michael was taking could not have caused intoxication "singularly or in combination." Tr. 839. Further, Dr. Sherman also stated that he did not believe that Michael was suffering from delusions or hallucinations, though he did have signs of obsessions and disassociation. Tr. 856, 871, 888. Based on his evaluations of Michael, Dr. Sherman stated the following: "I didn't think his mental status was impaired at the time of the instant offense at the point of not knowing the wrongfulness of the acts." Tr. 844. He also found, within a reasonable degree of

medical certainty, that Michael "acted with an intent to bring a certain result." Tr. 844.

**{¶32}** At trial, the State's second expert witness, Dr. Beech, testified that, unless a person overdoses on an antidepressant, "there is * * * no known intoxication from antidepressant medications any more than there is intoxication from blood pressure medications or antibiotics." Tr. 948-949. For this reason, Dr. Beech determined that Michael could not have been intoxicated because there was no evidence that Michael had "ingested any intoxicating substance." Tr. 949. At trial, Dr. Beech stated his conclusion from the evidence:

> **[Michael] was coherent, cognizant, alert, oriented and responsive before, during, and after the act. Evidence for this, he behaved as his usual self to the babysitter and constructed and conveyed a coherent alibi to her; drove to and from the babysitter without incident; called 9-1-1 calmly and succinctly reported to the dispatcher the events that had occurred and followed the instructions to start CPR. He followed the instructions of the first responders and answered their questions; answered questions of the detective during booking, including many details, phone number, birth dates; requested a lawyer after being advised of his rights. So there was just, there was no evidence that he was intoxicated as we understand intoxication.**

Tr. 950. Dr. Beech also testified that Michael's homicidal ideations appeared to be a symptom of Michael's underlying medical condition (OCD), which was a key finding that he suggested Dr. Breggin's medical report overlooked. Tr. 952-955.

**{¶33}** At trial, the Defense's expert witness reached a conclusion that contradicted the conclusions of the State's expert witnesses. The jurors, as the

finders of fact, were free to resolve this conflict by finding the testimony of the State's expert witnesses to be more believable than the testimony of the Defense's expert witness. The jury could have reasonably concluded, from the evidence presented at trial, that Michael was not involuntarily intoxicated at the time of his son's death. After reviewing the evidence in the record, we do not find any indications that the jury lost its way and returned a verdict against the manifest weight of the evidence. For these reasons, Michael's first and second assignments of error are overruled.

*Third Assignment of Error*

{¶34} Michael asserts that the trial court erred by denying his Crim.R. 29 motion. He argues that his conviction was not supported by sufficient evidence because the State failed to produce "evidence that contravenes the affirmative defense" of involuntary intoxication. Appellant's Brief, 23.

Legal Standard

{¶35} Crim.R. 29 reads, in its relevant part, as follows:

**(A) Motion for Judgment of Acquittal. The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses.**

Crim.R. 29(A). "Thus, a motion for acquittal tests the sufficiency of the evidence."

*State v. Kaczmarek*, 2013-Ohio-5658, 5 N.E.3d 1045 (3d Dist.).

**{¶36}** "A challenge to the sufficiency of the evidence supporting a conviction requires a court to determine whether the state has met its burden of production at trial." *In re Swift*, 8th Dist. Cuyahoga No. 79610, 2002 WL 451226, 3 (March 21, 2002), citing *Thompkins, supra*. Consequently, an appellate court is not to examine whether the evidence presented should be believed but should rather "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Johnston*, 3d Dist. Logan No. 8-13-10, 2014-Ohio-353, ¶ 10, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds in State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997). The sufficiency-of-the-evidence analysis addresses the question of whether adequate evidence was produced for the case to be considered by the trier of fact and, thus, whether the evidence was "legally sufficient to support the verdict * * *." *State v. Worthington*, 3d Dist. Hardin No. 6-15-04, 2016-Ohio-530, ¶ 12, citing *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 219.

**{¶37}** Sufficiency of the evidence is a question of law and a "test of adequacy rather than credibility or weight of the evidence." *State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19, citing *Thompkins, supra*, at 386. The standard for sufficiency of the evidence

**is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.**

*Plott*, *supra*, at ¶ 62, citing *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 47.  To establish the crime of aggravated murder under R.C. 2903.01(C), the State must prove the defendant "[1] purposely cause[d] [2] the death of another [3] who is under thirteen years of age at the time of the commission of the offense."  R.C. 2903.01(C).

{¶38} However,  "[s]ufficiency-of-the-evidence  review  concerns  'the sufficiency of the state's evidence, not the strength of defense evidence' and is accordingly 'applied with explicit reference to the *substantive elements of the criminal offense as defined by state law*.'"  (Emphasis sic.)  *State v. Owens*, 3d Dist. Allen Nos. 1-18-48, 1-18-49, 2019-Ohio-440, ¶ 11, quoting *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 38, quoting *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), fn. 16.  For this reason, "the due process 'sufficient evidence' guarantee does not implicate affirmative defenses, because proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime."  *Hancock*, *supra*, at ¶ 37, quoting *Caldwell v. Russell*, 181 F.3d 731, 740 (6th Cir. 1999), *abrogated on other grounds by the Antiterrorism and Effective Death Penalty Act*, 28 U.S.C. 2261 et seq.

Legal Analysis

**{¶39}** In this assignment of error, Michael challenges the sufficiency of the evidence supporting his conviction on the grounds that the State did not present adequate evidence to rebut the affirmative defense he raised at trial. However, involuntary intoxication is an affirmative defense that the defendant has the burden of proving by a preponderance of the evidence. *Kortz, supra*, at ¶ 20. Affirmative defenses are a part of the Defense's case. *State v. Belanger*, 2010-Ohio-5407, 941 N.E.2d 1265 (3d Dist.) (holding that the Defense has the burden of introducing sufficient evidence to substantiate an affirmative defense). A sufficiency-of-the-evidence review examines the State's case to determine whether the prosecution carried the burden assigned to the State. *Johnston, supra*, at ¶ 10.

**{¶40}** In this case, the State had the burden of producing evidence to substantiate each of the essential elements for the crime of aggravated murder. The State did not have the burden of establishing that Michael was not involuntarily intoxicated. Thus, Michael essentially argues that the State's case is deficient because the prosecution failed to carry a burden that was not assigned to it. Further, Michael does not challenge the sufficiency of the evidence that the State presented to substantiate the essential elements of the crime of aggravated murder. For this reason, "we decline to conduct [a] sufficiency-of-the-evidence review * * *." *State v. Owens*, 3d Dist. Allen Nos. 1-18-48, 1-18-49, 2019-Ohio-440, ¶ 11. Thus, Michael's third assignment of error is overruled.

*Conclusion*

**{¶41}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Putnam County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**ZIMMERMAN, P.J. and PRESTON, J., concur.**

**/hls**