[Cite as *State v. Tussing*, 2024-Ohio-5757.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

DEREK TUSSING,

    DEFENDANT-APPELLANT.

CASE NO. 1-24-03

O P I N I O N

---

Appeal from Allen County Common Pleas Court
Trial Court No. CR2023 0034

**Judgment Affirmed**

**Date of Decision: December 9, 2024**

---

**APPEARANCES:**

    *Kenneth J. Rexford* **for Appellant**

    *John R. Willamowski, Jr.* **for Appellee**

**MILLER, J.**

{**¶1**} Defendant-Appellant, Derek Tussing ("Tussing"), appeals from the December 22, 2023 judgment of the Allen County Court of Common Pleas, following a jury trial where he was found guilty of committing robbery and grand theft of a motor vehicle. On appeal, among other arguments, Tussing claims the trial court erred in its rulings concerning intoxication, the defense of not guilty by reason of insanity, and jury instructions for a lesser included offense. For the reasons that follow, we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

{**¶2**} On February 16, 2023, Tussing was indicted on three charges: (1) robbery, in violation of R.C. 2911.02(A)(3), a third-degree felony; (2) grand theft of a motor vehicle, in violation of R.C. 2913.02(A)(1), a fourth-degree felony; and (3) felonious assault, in violation of R.C. 2903.11(A)(1), a second-degree felony.

{**¶3**} The charges arose from an incident that took place on October 29, 2022. According to Teresa Ring ("Teresa"), Tussing opened her car door, grabbed her arm, and pulled her out of the car. She was able to break away from Tussing, got back in her car, and locked the doors. After Tussing pounded on her car window, he turned around and went to a nearby truck, which belonged to Teresa's brother, Ron Ring ("Ron"). Without Ron's permission, Tussing opened the truck's door,

started it, and drove it directly into a silo, causing significant damage to the truck. (*See, e.g.,* Trial Tr. at 248, 250; State's Exhibits 6, 11).

{¶4} Officer Clayton Eichman ("Officer Eichman") arrived shortly thereafter, and he witnessed Tussing yelling that the police needed to save his daughter. After Officer Eichman placed Tussing in the back of his police cruiser, Tussing said that people had taken his daughter to the grain elevator, they were going to kill her, that is why he took the truck, and he was going to kill those people for taking her. Referring to driving the truck into the silo, Tussing said, "I rammed them. I did that." (Trial Tr. at 270). According to Officer Eichman, Tussing was very irrational and exhibiting signs consistent with intoxication.

{¶5} On May 10, 2023, Tussing entered a written plea of not guilty by reason of insanity ("NGRI"). Pursuant to R.C. 2945.371, he moved the trial court to order evaluations of his present mental condition (competency) and his mental condition at the time of the offenses charged. The court granted the motion and ordered the evaluations, which were conducted by Dr. Carla Dreyer ("Dr. Dreyer"), a forensic psychologist.

{¶6} According to Dr. Dreyer's reports, Tussing "noted that he was psychotic at the time of the offenses charged, with hallucinations and delusions that he believes were related to his voluntary substance abuse." (Aug. 10, 2023 Entry). Tussing's statements to Dr. Dreyer also included "that he purchased what he

believed to be heroin from an unknown dealer, used the drugs, and that his memory became fuzzy." (Oct. 23, 2023 Judgment Entry). After the events of October 29, Tussing "learned that he tested positive for methamphetamine and cocaine." (*Id.*) Tussing also told Dr. Dreyer that on October 29 he believed people "had his daughter and were trying to put her into some machinery to grind her up," which "led him to engage in the activities" that are the subject of this case. (*Id.*).

{¶7} Dr. Dreyer also reviewed police reports and Tussing's medical records before providing her opinion concerning Tussing's mental condition at the time of the charged offenses: "Given the available information, it is my professional opinion that the defendant did not suffer from a severe mental defect or a severe mental disease that prevented him from knowing the wrongfulness of his behavior at the time of the offenses charged." (*Id.*). At a subsequent pretrial hearing, Dr. Dreyer testified that, "[a]t the time of the offense, [Tussing's] substance induced psychosis prevented him from knowing the wrongfulness of his behavior at the time." (*Id.*). Consisted with the opinion in her reports, she also testified that this voluntary intoxication did not amount to being not guilty by reason of insanity, because Tussing did not have a severe mental illness or defect. (*Id.*).

{¶8} In a pretrial ruling, the trial court decided that Dr. Dreyer would be allowed to "testify that the drugs found in the defendant's system (if there is actual evidence of what drugs were in his system) can result in a delusional state of mind,

if she is of this opinion." (Emphasis deleted.) (Dec. 4, 2023 Judgment Entry). Additionally, Dr. Dreyer would be allowed to testify "about what a delusional state of mind means and how a person may behave while delusional." (*Id.*). However, she was barred from testifying "as to the defendant's state of mind at the time of the offense, particularly whether he acted purposely, knowingly, reckless, and/or negligently." (*Id.*).

{¶9} The trial took place on December 18 and 19, 2023. Tussing testified that, on October 29, 2022, he purchased some "street drugs" from someone he did not know, took them of his own volition, and, as the effects hit him, he realized that the drugs had the effects of methamphetamine. He explained that he knew the effects of methamphetamine because, according to Tussing, he had been hospitalized once before for hallucinations and treated for methamphetamine psychosis.

{¶10} According to Tussing, after using the drugs, he started hallucinating that his daughter was in danger. He heard screaming from a catwalk at the top of a granary and saw people up there with his daughter, so he began looking for a way to shut off the power to the granary. He saw a woman in her vehicle (who turned out to be Teresa), pounded on the window, thought she invited him to come into the vehicle, opened the vehicle's door, told her something was going on with his daughter, and asked her for help. Teresa "said no and she pulled her door shut and

-5-

locked it." (Trial Tr. at 387). Tussing testified that it was not his intent to take Teresa's vehicle.

{¶11} According to Tussing, he then turned around and saw Ron's truck (which had the keys in it), got into the truck, and drove toward the electrical power box on the exterior of the silo. At the time, he thought the people who he believed had his daughter "were putting [his] daughter down in that thing, the grinder, so [he] was trying to hit the power grid to cut the power off." (*Id*. at 388). Tussing crashed the truck into the wall of the silo, crushing the truck. He testified that, as he was approaching the wall, his intention was "to drive into the power grid and knock the power out to the grinder." (*Id.* at 430). Tussing explained at trial that he now knows that his daughter was not really taken by people, but he believed at the time that "it was totally real." (*Id.* at 433).

{¶12} Tussing's position at trial was that he "had no intent to take anything from [Teresa], such that no robbery occurred," and he "had no intent to permanently deprive [Ron] of his truck, such that no Grand Theft occurred." (Appellant's Brief at 8). Instead, his alleged purpose essentially was to borrow a vehicle in order to save his daughter.

{¶13} The jury found Tussing guilty of the first two charges, robbery and grand theft of a motor vehicle. The trial court then sentenced him to a total term of 48 months in prison. This appeal followed.

## II. ASSIGNMENTS OF ERROR

{¶14} Tussing raises four assignments of error for our review:

### First Assignment of Error

**The Trial Court deprived Mr. Tussing of a fair trial, in violation of his rights protected by the Ohio Constitution and the United States Constitution, by pre-judging the issue of voluntariness of intoxication and in refusing to allow Mr. Tussing to pursue the defense of Not Guilty by Reason of Insanity.**

### Second Assignment of Error

**The Trial Court erred in refusing to give to the Jury an instruction on Unauthorized Use of Property.**

### Third Assignment of Error

**The Trial Court erred as to Count I by severely limiting the defense ability to discuss Mr. Tussing's actual mental state at the time, because R.C. 2901.21, if interpreted in agreement with the Trial Court, is unconstitutional.**

### Fourth Assignment of Error

**The Trial Court erred by not crediting time served between execution of warrant and sentencing.**

## III. DISCUSSION

{¶15} For ease of discussion and analysis, we elect to review Tussing's assignments of error partially out of order, in a manner that facilitates our analysis.

### A. First Assignment of Error

{¶16} In the first assignment of error, Tussing asserts he "was insane at the time of the acts alleged in the Indictment." (Appellant's Brief at 9). He also asserts

that he was involuntarily intoxicated at the time and that the jury (as the trier of fact), not Dr. Dreyer, should have resolved whether his intoxication was voluntary. (*Id.* at 11-12). Accordingly, he argues the trial court made two errors of law. First, by deciding prior to trial that Tussing was not involuntarily intoxicated, the trial court erred in barring Tussing from making that defense to the jury at trial. Second, the trial court erred by (allegedly) concluding the defense of NGRI is not "available even if the accused was, at the time, voluntarily intoxicated." (*Id.* at 10).

### 1.     Applicable Law

#### a.     *Offenses at issue*

{¶17} As charged in this case, the robbery statute prohibits a "person, in attempting or committing a theft or in fleeing immediately after the attempt or offense," from using or threatening "the immediate use of force against another." R.C. 2911.02(A)(3). In turn, the theft statute prohibits a "person, with purpose to deprive the owner of property or services," from "knowingly obtain[ing] or exert[ing] control over either the property or services . . . [w]ithout the consent of the owner or person authorized to give consent." R.C. 2913.02(A)(1); *see also* R.C. 2913.02(B)(5) (clarifying that if the property stolen is a motor vehicle, then a violation of the section is grand theft of a motor vehicle). Thus, in this case, the culpable mental state for both the predicate theft for the robbery offense and the grand theft of a motor vehicle offense includes the mental states of 'purpose' and

'knowingly.' *Id.*; *State v. Godsey*, 2024-Ohio-629, ¶ 9 (3d Dist.). The culpable mental states statute provides,

> (A) A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature.

> (B) A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

R.C. 2901.22(A), (B).

### b.    *Intoxication*

{¶18} The term "intoxication" includes intoxication resulting from the ingestion of a drug. R.C. 2901.21(F)(4). Voluntary intoxication is not an affirmative defense and "may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense." R.C. 2901.21(E); *see also State v. Luebrecht*, 2019-Ohio-1573, ¶ 25 (3d Dist.). However, *involuntary* intoxication is an affirmative defense. *Luebrecht* at ¶ 25. The defendant bears the burden of proof—by a preponderance of evidence—for the affirmative defense of involuntary intoxication. *Id.*; R.C. 2901.05(A).

**{¶19}** Examples of when a successful involuntary intoxication defense may arise include (1) the defendant's proper use of a prescribed medication that resulted in intoxicating effects unknown to the defendant, and (2) eating or drinking a non-intoxicating substance that—without the defendant's knowledge or consent—contained an intoxicating substance someone else secretly placed into it. *State v. Williamson*, 2019-Ohio-4380, ¶ 48 (6th Dist.); *State v. Jones*, 2010-Ohio-2777, ¶ 18-19 (8th Dist.) (trial court erred in refusing to allow defendant to pursue involuntary intoxication defense, where he claimed that someone slipped something into a drink he believed to be non-alcoholic). On the other hand, an involuntary intoxication defense does *not* apply if the defendant voluntarily used illegal drugs that, unbeknownst to the defendant, turned out to actually be a different illegal drug. *E.g., People v. Gallego*, 52 Cal.3d 115, 183-184 (1990) (defendant could not have been involuntarily intoxicated where he "voluntarily consumed alcohol and drugs [prior to the crime], but he asserts PCP was secretly given to him while he was taking other illegal drugs"); *United States v. Bindley*, 157 F.3d 1235, 1242 (10th Cir. 1998) ("a key component" in the defense of involuntary intoxication "is lack of culpability on the part of the defendant in causing the intoxication," so it was "not surprising" neither the defendant nor the court found caselaw "in which the defense has been recognized where a defendant has knowingly ingested an illegal substance"); *People v. Davis*, 2017 IL App (1st) 150134-U, ¶ 32 (collecting cases).

An Illinois appellate court, having surveyed similar cases across the country, explained:

> [D]efendant argues that the defense of involuntary intoxication was available to him based on his ingestion of marijuana, which he believed was laced with another substance. However, defendant knowingly ingested the marijuana prior to committing the offenses on March 29, 2004, a fact he concedes on appeal. In 2004, marijuana possession and usage were unlawful. . . . The fact that the marijuana might have been laced with something else, causing defendant's substance-induced psychosis, is immaterial to whether the defense would have been available to him. See *United States v. Bindley*, 157 F.3d 1235, 1243 (10th Cir. 1998) (finding an involuntary intoxication defense unavailable to a defendant who voluntarily smoked a marijuana cigarette that he subsequently believed was laced with another drug because he 'had no right to assume smoking the marijuana cigarette would produce a predictable effect' and not possibly be 'laced with an adulterant,' and therefore, 'by voluntarily choosing to smoke the marijuana cigarette, any resulting intoxication (whatever that may have been) was likewise voluntary').
>
> . . . The fact that the marijuana defendant ingested may have reacted with an unknown substance and produced adverse side effects is immaterial. That is the risk defendant took when he voluntarily ingested an illegal substance. See *Bindley*, 157 F.3d at 1243.
>
> . . .
>
> Given the defense of involuntary intoxication would have been unavailable to defendant at trial, his petition has not made a substantial showing that he was prejudiced by trial counsel's alleged failure to investigate and pursue the defense.

*Davis*, 2017 IL App (1st) 150134-U, at ¶ 29-33.

### c.    NGRI

**{¶20}** Like involuntary intoxication, "NGRI is an affirmative defense that a defendant must prove by a preponderance of the evidence." *State v. Grate*, 2020-Ohio-5584, ¶ 76; *see also* R.C. 2901.05(A).  "A person is 'not guilty by reason of insanity' relative to a charge of an offense only if the person proves, in the manner specified in [R.C. 2901.05], that at the time of the commission of the offense, the person did not know, *as a result of a severe mental disease or defect*, the wrongfulness of the person's acts."  (Emphasis added.) R.C. 2901.01(A)(14); *see also* R.C. 2945.371 (evaluations of mental condition).  "The proper standard for determining whether a defendant has successfully demonstrated this defense and thus is entitled to an NGRI instruction is whether he has introduced sufficient evidence, which if believed, would raise a question in the mind of a reasonable person concerning the existence of the issue."  *Grate* at ¶ 76-78 (counsel was not ineffective for not pursuing NGRI defense based on expert findings that defendant did not qualify for an insanity defense).  Additionally, "[p]roof that a person's reason, at the time of the commission of an offense, was so impaired that the person did not have the ability to refrain from doing the person's act or acts, does not constitute a defense." R.C. 2945.391.

### 2. Analysis

**{¶21}** We find no error by the trial court. First, the facts presented never supported a possible involuntary intoxication defense. From the onset, Tussing's own statements to Dr. Dreyer included "that he purchased what he believed to be heroin from an unknown dealer [and] used the drugs." (Oct. 23, 2023 Judgment Entry). At trial, Tussing admitted to freely and willingly using illegal drugs purchased from an unknown dealer that, according to Tussing, he believed was one type of drug but ended up being something different. (Trial Tr. at 381-382, 416-417, 434). Therefore, there was never any factual basis to find that Tussing was involuntarily intoxicated. *Gallego*, 52 Cal.3d at 183-184; *Bindley*, 157 F.3d at 1242; *Davis*, 2017 IL App (1st) 150134-U, at ¶ 32. Tussing is mistaken when he contends that Dr. Dreyer was the one who decided his intoxication was voluntary. Instead, by his own admission of using illegal drugs, he was voluntarily intoxicated under the law. *Id.* As shown above, voluntary intoxication is not an affirmative defense and could not be taken into consideration at trial in determining the existence of a mental state that is an element of a criminal offense. R.C. 2901.21(E); *see also Luebrecht*, 2019-Ohio-1573, at ¶ 25 (3d Dist.).

**{¶22}** Second, regarding NGRI, Tussing did not introduce evidence that would have raised a question in the mind of a reasonable person that he "did not know, *as a result of a severe mental disease or defect*, the wrongfulness of" his acts

-13-

at the time of the offenses. (Emphasis added.) R.C. 2901.01(A)(14). In fact, Dr. Dreyer's opinion found the exact opposite: Tussing "did not suffer from a severe mental defect or a severe mental disease that prevented him from knowing the wrongfulness of his behavior at the time of the offenses charged." Thus, even if Tussing showed that he did not know the wrongfulness of his acts because of the drugs he had ingested, he failed to prove that he did not know the wrongfulness of his acts "as a result of a severe mental disease or defect." *Id.*

{¶23} Tussing contends that involuntary intoxication "can be that 'mental disease or defect,' specifically the 'defect,' that can support NGRI, which addresses not voluntariness but sanity." (Appellant's Brief at 11). However, Tussing cites no legal authority for this contention. We also note Tussing's proposition neglects to address that he voluntary chose to consume illegal drugs. More importantly, legal authority contradicts his contention. The issue was addressed by the Second District in a case involving a psychologist who examined the defendant and provided a report. *State v. Johnston*, 2015-Ohio-450, ¶ 4 (2d Dist.).

> Since [the doctor's] testimony indicates that it was Johnston's voluntary overdose of medication, not a mental disease or defect, which affected his mental state on the night of the offenses, his testimony necessarily implicates voluntary intoxication as opposed to insanity. *See State v. Swanson,* 6th Dist. Wood No. WD–12–003, 2014–Ohio–549, ¶ 14 ("[w]here the insanity is simply a temporary condition brought on by the voluntary ingestion of drugs or alcohol, it does not suffice to establish [a not guilty by reason of insanity] defense").

*Id.* at ¶ 32. Similarly, the Sixth District addressed the issue in a case where a doctor testified that the defendant was previously diagnosed with a schizotypal personality disorder and "suffered from a drug-induced psychotic break at the time of the offenses." *State v. Swanson*, 2014-Ohio-549, ¶ 8, 17 (6th Dist.). The appellate court affirmed the trial court's rejection of the NGRI defense. It explained that, although the defendant "suffered from a personality disorder that can include delusions," the defendant's admission that he had taken more illegal drugs than he could handle supported the court's finding that defendant's psychosis at the time of the offenses "was the result of his voluntary ingestion of drugs and not a delusion brought about by his personality disorder." *Id.* at ¶ 17.

**{¶24}** To support his assignment of error, Tussing relies heavily on *State v. Davis*, 2021-Ohio-237 (11th Dist). However, critically, in that case "[t]here was no dispute from the physicians and experts who either treated Mr. Davis and/or evaluated his voluminous medical and psychological treatment records that he suffered from a mental disease and/or mental defect." *Id.* at ¶ 20. Davis "had a long-standing history of mental illness and psychiatric treatment." *Id.* at ¶ 1. Therefore, in contrast to the case here, "[t]he central issue of Mr. Davis's NGRI defense was whether he appreciated the wrongfulness of his actions since no one disputed that he suffered from mental illness." *Id.* at ¶ 20, 26-27.

**{¶25}** Tussing's first assignment of error is overruled.

## B. Third Assignment of Error

**{¶26}** In the third assignment of error, Tussing challenges the constitutionality of R.C. 2901.21(E) (concerning voluntary intoxication) as the trial court allegedly applied that statute. Tussing argues that, while he is entitled to a fair trial under the U.S. and Ohio Constitutions, "[o]ne cannot logically have a fair trial if the trier of fact cannot consider evidence of what Mr. Tussing intended with his actions, when intent is elemental as to each of the three counts, at least if what he intended was a fruit of psychosis from voluntary intoxication." (Appellant's Brief at 18). He alleges that Dr. Dreyer's "full testimony was intended to bolster" Tussing's claims regarding what he did and why for purposes of negating the mens rea element of the charges. (*Id.* at 20). According to Tussing, "[i]f R.C. §2901.21(E) is deemed to bar such testimony because the credibility of Derek Tussing pertains to the issue of *mens rea*, then the statute *as applied* violated the Ohio Constitution." ((Emphasis in original.) *Id.*).

### 1. Applicable Law

**{¶27}** "Legislation is entitled to a strong presumption of constitutionality." *State v. Hacker*, 2023-Ohio-2535, ¶ 11. A party bringing an "as-applied" challenge to a statute must show that the legislation is unconstitutional as applied to the specific set of facts, i.e., application of the statute in the particular context in which the party acted is unconstitutional. *Id.*; *Belden v. Union Cent. Life Ins. Co.*, 143

-16-

Ohio St. 329 (1944), paragraph six of the syllabus ("[w]here an act is challenged on the ground that it is unconstitutional when applied to a particular state of facts, the burden rests upon the party making such attack to present clear and convincing evidence of a presently existing state of facts which makes the act unconstitutional and void when applied thereto").

## 2.   Analysis

{¶28} Tussing's argument in support of this assignment of error is based on a faulty premise. Tussing was *not* severely limited in discussing his actual mental state at the time of his offenses, and the jury was able to consider evidence of what Mr. Tussing intended with his actions. In fact, Tussing testified at trial regarding: his use of illegal drugs prior to the offenses; his hallucinations and delusions that his daughter was in danger; that it was not his intent to take Teresa's vehicle, but instead his intent was to ask her for help, including to use her phone; and his intention in taking Ron's vehicle was "to drive into the power grid and knock the power out to the grinder" because he believed people were putting his daughter into the grinder. (Trial Tr. at 430). He also testified that he did not intend to keep Ron's truck but instead was trying to save his daughter with it. Thus, contrary to the premise of this assignment of error, Tussing was able to attempt to persuade the jury by testifying extensively about his own intentions at the time he committed the offenses.

-17-

{¶29} Turning to Dr. Dreyer's testimony, the trial court was concerned about witness vouching and the dangers of confusing the issues and misleading the jury, pursuant to Evid.R. 403. (*E.g.,* Dec. 4, 2023 Judgment Entry; Trial Tr. at 354-355). The trial court ruled Dr. Dreyer—who did not witness any of the offenses—could not testify "as to the defendant's state of mind at the time of the offense, particularly whether he acted purposely, knowingly, reckless, and/or negligently." (Dec. 4, 2023 Judgment Entry). However, the trial court permitted Dr. Dreyer to testify that methamphetamine and cocaine are substances that "could cause mental status changes," and it was "probable" those mental status changes could involve hallucinations. (Trial Tr. at 370). Dr. Dreyer also testified it was "probable" that delusions could be caused by using methamphetamine and cocaine. (*Id.* at 371). Dr. Dreyer further explained that hallucinations "are sensory perceptions" and a delusion is a "belief that is not found to be in reality." (*Id.*). Thus, the jury heard that delusions and hallucinations were possible results of Tussing's drug usage. Ultimately, Tussing has not shown that R.C. 2901.21 was unconstitutionally interpreted and applied in this case by the trial court.

{¶30} Tussing's third assignment of error is overruled.

### C.   Second Assignment of Error

{¶31} In the second assignment of error, Tussing argues that the trial court erred in denying his request for a jury instruction on the (alleged) lesser-included

-18-

offense of unauthorized use of a vehicle, in violation of R.C. 2913.03(B). At trial, Tussing requested a lesser included offense instruction specifically relating to R.C. 2913.03(B), and he now asserts that "[t]he evidence certainly supports a conclusion that Mr. Tussing had no intent to deprive Mr. Ring of his truck." (Appellant's Brief at 16).

### 1. Applicable Law

**{¶32}** "We review a trial court's refusal to give a requested instruction, including an instruction on a lesser-included offense, under an abuse of discretion standard." *State v. Robertson*, 2023-Ohio-2200, ¶ 46 (3d Dist.). A trial court abuses its discretion when its conduct is unreasonable, arbitrary, or unconscionable. *State v. Hill*, 2022-Ohio-4544, ¶ 9.

**{¶33}** "The trial court must view the evidence in the light most favorable to the defendant when deciding whether to instruct the jury on a lesser included offense." *State v. Trimble*, 2009-Ohio-2961, ¶ 192. "To determine whether a criminal defendant was entitled to a jury instruction (charge) on a lesser included offense requires a two-step analysis." *State v. Turks*, 2010-Ohio-5944, ¶ 18 (3d Dist.). "First, the reviewing court must determine whether the one offense is, in fact, a lesser included offense of the other offense." *Id.* "Second, the reviewing court must determine whether the trial court was obligated to give a jury instruction on the lesser included offense under the specific facts of the case." *Id.*

A jury instruction on a "lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas*, 40 Ohio St.3d 213 (1988), paragraph two of the syllabus.

**{¶34}** The theft statute prohibits a "person, with purpose to deprive the owner of property or services," from "knowingly obtain[ing] or exert[ing] control over either the property or services . . . [w]ithout the consent of the owner or person authorized to give consent." R.C. 2913.02(A)(1). The term "deprive" means any of the following:

> (1) Withhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or with purpose to restore it only upon payment of a reward or other consideration;
>
> (2) Dispose of property so as to make it unlikely that the owner will recover it;
>
> (3) Accept, use, or appropriate money, property, or services, with purpose not to give proper consideration in return for the money, property, or services, and without reasonable justification or excuse for not giving proper consideration.

R.C. 2913.01(C).

**{¶35}** On the other hand, the criminal statute for unauthorized use of a vehicle—which Tussing requested be included in jury instructions—provides, in part, that "[n]o person shall knowingly use or operate . . . [a] motor vehicle . . . without the consent of the owner or person authorized to give consent . . . and either

-20-

remove it from this state or keep possession of it for more than forty-eight hours." R.C. 2913.03(B). Thus, among other distinctions, this statute does not include the "purpose to deprive" element for grand theft of a motor vehicle. Instead, the statute requires the offender remove the vehicle from the state or keep possession of it for more than 48 hours.

### 2. Analysis

{¶36} The trial court did not abuse its discretion in refusing to give a jury instruction on unauthorized use of a vehicle. Even if we assume unauthorized use of a vehicle is a lesser included offense of grand theft of a motor vehicle, Tussing's argument fails at the second step of the analysis for multiple reasons. First, the evidence presented would not reasonably support a conviction on that offense. There was no evidence Tussing removed Ron's truck from this state or kept possession of it for more than 48 hours, as required for a violation of R.C. 2913.03(B).

{¶37} Second, the evidence presented also would not reasonably support an acquittal on the crime charged—grand theft of a motor vehicle. According to Tussing's own testimony, he took Ron's truck with the intention of ramming the silo to destroy the power box affixed to the side of the structure, and he drove into the silo at such speed that the truck was crushed. Photos admitted during the trial showed the truck suffered significant damage and was clearly inoperable after

Tussing drove it into the silo. (*E.g.,* State's Exhibits 6, 11). In line with requirements of the offense, this evidence demonstrated that Tussing, with purpose to deprive Ron of the truck, knowingly obtained control over the truck without Ron's consent. R.C. 2913.02(A)(1). *E.g., State v. Stoychoff*, 2021-Ohio-4248, ¶ 11-12 (3d Dist.) (where the trial court instructed on robbery and grand theft of a motor vehicle, no error in refusing to instruct on unauthorized use of a vehicle, even though defendant arguably only was using the vehicle to flee from law enforcement at high speed, resulting in its engine exploding). Tussing took the truck fully intending to crash it into the power box attached to the side of the granary. Clearly, he had no intention of returning the truck in the same condition as when he took it, thereby depriving Ron of the use of his truck, which was ruined.

**{¶38}** Tussing's second assignment of error is overruled.

### D.     Fourth Assignment of Error

**{¶39}** In the fourth assignment of error, Tussing argues the trial court erred by not crediting him for certain time served in custody while awaiting trial. According to Tussing, although the trial court set an own-recognizance bond, he did not sign the bond to effectuate it. To Tussing, this this means he should have been given credit for time served in custody awaiting trial and sentencing on this case. He asks that this matter be remanded to calculate time served from when the sheriff served him with the warrant and indictment in this case (February 22, 2023) until

bond was posted (October 31, 2023). The State counters that throughout the time Tussing claims he should have been credited, he was already imprisoned pursuant to another conviction and is not entitled to double credit.

### 1. Applicable Law

{¶40} If the sentencing court determines at the sentencing hearing that a prison term is necessary or required, then "the sentencing court shall determine the number of days 'the offender has been confined for any reason arising out of the offense for which the offender is being sentenced . . . .'" *State v. Dyer*, 2022-Ohio-1519, ¶ 13 (7th Dist.), quoting R.C. 2929.19(B)(2)(g)(i). In turn, the statute concerning "credit for confinement awaiting trial and commitment" provides, "The department of rehabilitation and correction shall reduce the prison term of a prisoner . . . by the total number of days that the prisoner was confined for any reason arising out of the offense for which the prisoner was convicted and sentenced . . . ." R.C. 2967.191(A). Thus, there is no jail-time credit for time served on unrelated offenses. *State v. Struble*, 2006-Ohio-3417, ¶ 11 (11th Dist.) (explaining this is the case "even if that time served runs concurrently during the pre-detention phase of another matter").

### 2. Analysis

{¶41} Tussing was incarcerated on an unrelated matter at the time of the indictment in this case. This is evidenced in the record by the State's February 16,

2023 Request for Issuance of Warrant, which was directed to inmate Tussing at a state correctional institution. On the same day as the indictment, the trial court issued an order setting an own-recognizance bond. Then, on October 24, 2023 while this case was pending and in anticipation of Tussing being released from prison on November 2, the State filed a motion to modify Tussing's bond to a cash or surety bond. On October 26, 2023, the trial court amended the bond from an own-recognizance bond to a $50,000.00 cash or surety bond. According to the docket, the deposit for that bond was posted, and an order to release was issued, on October 31, 2023.

{¶42} At the December 21, 2023 sentencing hearing, the trial court addressed jail-time credit. The trial court explained that it had imposed a prison term on Tussing prior to the incident that led to this case. Tussing's counsel then interjected that the own-recognizance bond set in this case was "never executed." (Dec. 21, 2023 Tr. at 31). The trial court responded that, even so, Tussing had been in prison through the pendency of this case for a reason separate from the offenses in this case.

{¶43} Upon review, we see no error in the trial court's decision not to credit Tussing for time served in custody between February 22 and October 31, 2023. There is no indication that Tussing was "confined for any reason arising out of the offense for which the offender" was convicted and sentenced. R.C.

-24-

2929.19(B)(2)(g)(i); R.C. 2967.191(A). The fact Tussing refused to sign his own-recognizance bond is of no matter as Tussing was imprisoned for an unrelated crime.

**{¶44}** The Seventh District previously addressed, and rejected, an argument similar to Tussing's argument. *See State v. Barrow*, 2021-Ohio-2340, ¶ 12-14 (7th Dist.). In *Barrow*, the appellant was serving a prison term on an unrelated case when he was indicted on new charges. The appellant refused to sign the recognizance bond and later suggested on appeal he therefore was not subject to the Supreme Court of Ohio's holding in *State v. Cupp*, 2018-Ohio-5211, syllabus, that "[a] defendant is not entitled to jail-time credit while held on bond if, at the same time, the defendant is serving a sentence on an unrelated case." The Seventh District rejected the appellant's argument and held that a defendant who was indicted while serving a prison term on an unrelated case is not entitled to jail-time credit for the time served on that unrelated case. *Barrow* at ¶ 12-14. The fact the appellant did not sign the recognizance bond was irrelevant to the issue because he was already serving an unrelated prison sentence. *Id.*; *see also Dyer*, 2022-Ohio-1519, at ¶ 19 (7th Dist.). The same is true for Tussing.

**{¶45}** Tussing's fourth assignment of error is overruled.

## IV. CONCLUSION

**{¶46}** For the foregoing reasons, Tussing's assignments of error are overruled. Having found no error prejudicial to the appellant in the particulars assigned and argued, we affirm the judgment of the Allen County Court of Common Pleas.

*Judgment Affirmed*

**WALDICK and ZIMMERMAN, J.J., concur.**

**/jlm**